525 A.2d 222

Gerald PASSNAULT

v.

The BOARD OF ADMINISTRATIVE APPEALS FOR PRINCE GEORGE'S COUNTY.

No. 69, Sept. Term, 1986.

Court of Appeals of Maryland.

May 13, 1987.

Shelly E. Mintz (Stephen A. Friedman and Joseph, Greenwald & Laake, P.A., on the brief), Hyattsville, for appellant.

Alan E. D'Appolito, Associate Co. Atty. (Thomas P. Smith, Co. Atty. and Michael O. Connaughton, Deputy Co. Atty., on the brief), Upper Marlboro, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

COUCH, Judge.

This appeal relates to the authority of the Prince George's County Department of Licenses and Permits to issue a notice of violation of the Prince George's County Building Code. For the reasons herein expressed, we hold that, in Prince George's County, the purchaser of a dwelling house constructed in violation of the building code is the

proper party to serve with a notice of violation after title has passed from the vendor to the purchaser.

## I

The facts are not in dispute. In 1977, Gerald Passnault commenced construction of a single family dwelling in Prince George's County pursuant to a building permit issued by the Prince George's County Department of Licenses and Permits (Department). The house, originally intended as a residence for Passnault's daughter, was eventually placed on the market for sale.

While the house was still under construction, Passnault entered into an executory contract for the sale of the property with Bill and Carolyn Bryant, the present owners, in November, 1978. On June 14, 1979, following the standard series of interim approvals and inspections, the Department issued a certificate of use and occupancy. It is at this point that exact dates are difficult to extract from the record but it is clear that sometime in 1979, after the use and occupancy permit was issued, Passnault conveyed title to the property to the Bryants.

Shortly after the Bryants moved in, at some later time in 1979, they became aware of water leakage in the house. It appears that the Bryants initially complained about the roof leakage to Passnault and that Passnault, in response to their complaint, attempted to remedy the problem on at least one occasion in the early 1980s. Sometime thereafter, the Bryants, still dissatisfied, recontacted Passnault who refused further assistance. In December, 1983, the Bryants called the Department and requested that the Department dispatch a building inspector to investigate the leakage problem. The building inspector subsequently issued three notices of violation of the Prince George's County Building Code, all of which were served on Passnault. These notices cited Passnault with violations of two model codes, the CABO One & Two Family Dwelling Code and the

BOCA Building code, which are adopted and incorporated by reference in the Prince George's County Building Code.[1]

The first notice of violation, a field notice dated June 18, 1984, cited Passnault with a violation of § R–803, "Composition Asphalt Organic Felt Shingles," of the CABO One & Two Family Dwelling Code.[2] The notice read as follows:

---

**1.** We discuss more fully, *infra,* the interrelationship and significance of the various codes.

**2.** *Section R–803–Composition Asphalt Organic Felt Shingles*

*R–803.1–High Slope Application for Asphalt Roofing Shingles.* Composition shingles shall be applied only to solidly sheathed roofs. Composition shingles shall not be installed on a roof having a slope of less than four (4) in twelve (12) unless approved by the Building Official.

Composition shingle roofs shall have an underlay of not less than fifteen (15) pound felt, applied as required for a base sheet. The underlay may be omitted over existing roofs, or where the roof slope exceeds seven (7) inches to twelve (12) inches, or where shingles are laid not less than three thicknesses at any point.

*R–803.2–Low Slope Application for Asphalt Roofing Shingles.* Asphalt shingles laid with double coverage may be installed on slopes as low as two (2) in twelve (12), provided the shingles are approved self-sealing shingles or are hand sealed and are installed with an underlayment consisting of two (2) layers of Type 15 felt, applied shingle fashion. In areas where the January daily average temperature is twenty-five (25) degrees F. or less, or where there is a possibility of ice forming along the eaves and causing a back up of water, the two (2) layers of felt shall be cemented together from the eaves up the roof to overlie a point twenty-four (24) inches inside the interior wall line of the building.

*R–803.2.1–Attachment.* Nails for composition roofs shall be not smaller than No. twelve (12) gauge, with heads not less than three-eighths (³⁄₈) inch in diameter for shingle application and shall be long enough to penetrate into the sheathing three-quarters (³⁄₄) inch or through the thickness of the sheathing, whichever is less. Smaller size head nails may be used provided metal discs are used with them. Exposed nails and shingle nails shall be corrosion-resistant.

Composition shingles shall be fastened according to manufacturer's printed instructions but not less than four (4) nails per each strip shingle not more than thirty-six (36) inches wide and two (2) nails per each individual shingle less than twenty (20) inches wide.

*R–803.2.2–Valleys.* Roof valley flashing shall be provided of not less than No. 28 galvanized sheet gauge corrosion-resistant metal and shall extend at least eight (8) inches from the center line each way, and shall have a splash diverter rib not less than three-quarters (³⁄₄) inch high at the flow line formed as part of the flashing. Sections of flashing shall have an end lap of not less than four (4) inches.

"Nails holding roof shingles are too short and flashing of roof improperly installed, causing leaks and rot in roof."

Upon Passnault's failure to take any corrective action pursuant to the notice, the Department issued a second notice of violation. The second notice, dated July 16, 1984, charged Passnault with violating four provisions of the BOCA Basic Building Code: § 854.4.4 "Nailing"; § 854.8.3 "Asphalt Shingles"; § 854.9 "Flashing"; and § 926.6 "Shingle Application".[3]

---

Roof valley flashing may be of laced composition shingles, applied in an approved manner, with an underlay of not less than thirty (30) pound felt extending ten (10) inches from the center line each way, or shall be of two (2) layers of ninety (90) pound mineral surfaced cap sheet cemented together with the bottom layer not less than twelve (12) inches wide laid face down, and the top layer not less than twenty-four (24) inches wide laid face up.

3. *854.4.4 Nailing:* All weatherboarding and wall and roof coverings shall be securely nailed with aluminum, copper, zinc, zinc-coated or other approved corrosion-resistive nails in accordance with the recommended nailing schedule or the approved manufacturer's standards. Shingles and other weather coverings shall be attached with appropriate standard shingle nails to furring strips securely nailed to studs, or with approved mechanically-bonding nails, except when sheathing is wood not less than one (1) inch nominal thickness or plywood not less than five-sixteenths ($^5/_{16}$) inch thick. Wood shingles or shakes attached with approved corrosion-resistive annular grooved nails may be applied over fiberboard shingle backer and fiberboard sheathing when the installation is in accordance with the approved manufacturer's standards listed in Appendix C. Wood shingles or shakes and asbestos shingles or siding may be nailed directly to nail base fiberboard sheathing not less than one-half ($^1/_2$) inch nominal thickness with approved corrosion-resistive annual grooved nails when the installation is in accordance with the approved manufacturer's standards listed in Appendix C.

*854.8.3 Asphalt shingles:* Asphalt shingle roofs shall have an underlay of not less than fifteen (15) pound felt, adequately attached, applied as required for a base sheet. The underlay may be omitted over existing roof or where the slope is five (5) inches to twelve (12) inches or more, or where the shingles are laid not less than three (3) thicknesses at any point.

*854.9 Flashing:* Approved corrosion-resistive flashing shall be provided at top and sides of all exterior window and door openings in such manner as to be leakproof. Similar flashings shall be installed at the intersection of chimneys or other masonry construction with frame or stucco walls, with projecting lips on both sides under stucco copings; under and at the ends of masonry, wood or metal copings

Again, Passnault took no action, and a third notice of violation was issued. The third notice, an office notice dated July 18, 1984, cited Passnault with a violation of § R–803 of the CABO One & Two Family Dwelling Code, as did the first field notice. The office notice contained the text of § R–803 and directed Passnault to take the following corrective action:

"Properly install flashing on roof. Lengthen nails holdong [sic] roof shingles."

Passnault challenged the aforementioned notices in an appeal to the Board of Administrative Appeals for Prince George's County. The Board, in affirming the notices of violation, concluded that:

"1. The roofing and flashing were improperly installed;

2. The contractor is responsible for installing the roof and flashing correctly;

3. Petitioner [Passnault] was the contractor listed on the permit;

4. Petitioner is responsible for having the roof and flashing deficiencies corrected, repaired and/or replaced."

Passnault appealed the decision of the Board and the Circuit Court for Prince George's County affirmed. The Circuit Court, noting that limitations do not run against a municipality for an exercise of a purely governmental function, held that "there is jurisdiction in the Prince George's County government to enforce the housing code."

---

and sills; continuously above all projecting wood trim; at wall and roof intersections; under built-in gutters; at junction of chimneys and roofs; in all roof valleys and around all roof openings.

*926.6 Shingle application:* Asphalt shingles laid with double coverage may be installed on slopes below four (4) to twelve (12) inches to as low as two (2) to twelve (12) inches, provided the shingles are approved self-sealing shingles or are hand sealed and are installed with an underlayment consisting of two layers of No. 15 felt, applied shingle fashion. In areas where the January daily average temperature is twenty-five (25) degrees F. or less, or where there is a possibility of ice forming along the eaves and causing a back up of water, the two layers of felt shall be cemented together from the eaves up the roof to overlie a point twenty-four (24) inches inside the interior wall line of the building.

An appeal to the Court of Special Appeals followed and that court affirmed in an unreported, *per curiam*, opinion. The intermediate appellate court determined that:

"Nothing in [the BOCA and CABO Codes] limits the authority of the Department to issue a notice of violation of the provisions of those codes to a builder who has received a certificate of use and occupancy from the Department after its inspections of a completed building or after it is sold. Nor is there any validity to the appellant's assertion that since the building inspectors of the Department failed to discover the violations prior to the Department's issuance of a certificate of occupancy for the dwelling, the Department is estopped from issuing the violation notices."

We granted the petition for writ of certiorari to determine whether the Prince George's County Department of Licenses and Permits has the authority to serve a notice of violation on the vendor or builder of a dwelling house constructed in violation of the building code and compel the vendor or builder to abate the violation some five years after the dwelling was constructed and sold to a third party. We hold there is no such authority.

## II

Subtitle 4, entitled "Building," of the Prince George's County Code (County Building Code) adopts and incorporates the 1984 BOCA Basic Building Code (BOCA Building Code).[4] P.G. County Code, § 4–101 (1983, 1984 Supp.). Likewise, the County Building Code adopts and incorporates the 1983 CABO One & Two Family Dwelling Code (CABO Code).[5] *Id.* at § 4–108.1.[6]

---

**4.** BOCA, the Building Officials and Code Administrators, International, Inc., is a non-profit service organization responsible for the promulgation of a series of model regulatory codes relating to building, housing and zoning. Gale Research Company, *Encyclopedia of Associations* § 3 (20th ed. 1986).

**5.** CABO, the Council of American Building Officials, is a nonprofit service organization involved in the development and promotion of

**6.** See note 6 on page 472.

The BOCA Building Code is a national model regulatory construction code which provides detailed minimum standards for safe practices, materials and systems of construction. The code covers such subjects as "Building Enclosures, Walls and Wall Thickness," "Structural Loads and Stresses," "Fire Resistive Construction Requirements," and "Plumbing Systems." It further includes general provisions relating to administration and enforcement. The regulations of the BOCA Building Code "control all matters concerning the construction, alteration, addition, repair, removal, demolition, use, location, occupancy and maintenance of all buildings and structures, and shall apply to existing or proposed buildings and structures." BOCA Building Code § 100.2 (1978).

The CABO Code is a compilation of data from several model codes, including the BOCA Building Code, designed to standardize building requirements of detached one and two family dwellings. The CABO Code is "to be used in interpreting the requirements of the [BOCA Building] Code as they pertain to one- and two- family dwellings." P.G. County Code, § 4–108.1 (1983, 1984 Supp.). The provisions of the CABO Code "apply to the construction, prefabrication, alteration, repair, use, occupancy and maintenance of detached one or two family dwellings not more than three stories in height, and their accessory structures." CABO One & Two Family Dwelling Code, § R–103 (1983). The significant distinction between the BOCA Building Code and the CABO Code, for purposes of this appeal, is that the provisions of the BOCA Building Code apply to all buildings and structures whereas the provisions of the CABO Code apply to one and two family dwellings.

---

uniform building regulations. CABO, in cooperation with BOCA and others, published the One & Two Family Dwelling Code. *Id.*

**6.** Inasmuch as the BOCA Building Code and the CABO Code are incorporated by reference in the County Building Code, we shall, for purposes of clarity, cite those codes directly where appropriate.

The enforcement provisions of the BOCA Building Code and CABO Code are representative of the enforcement provisions in similar local regulatory schemes both in Maryland and in other jurisdictions, *see, e.g.,* 9A McQuillin, *Municipal Corporations* § 26.200 *et seq.* (1986); 1B Matthews, *Municipal Ordinances* §§ 37.01–37.06 (1986 Rev.), and are set forth in full at Appendix A and B. The basic pattern of the enforcement mechanism is as follows:

1. that it is an unlawful act to erect, construct, use, occupy, maintain, etc., a structure contrary to the specifications of the code;

2. that such an unlawful act is a public nuisance;

3. that such an unlawful act is a misdemeanor punishable by fine, imprisonment, or both;

4. that the building official has two avenues of enforcement, namely, he or she may issue a notice of violation and compel the wrongdoer to abate the unlawful action, or he or she may bring a civil suit to enjoin the violation.

The single provision which addresses service of notice of violation is contained in the BOCA Building Code at § 117.2:

"The building official shall serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, removal, demolition, use or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation."

## III

The preliminary matter presented by the case *sub judice* concerns the application of the various codes to the present facts. The Department served three notices of violation on Passnault. The first and third notices cited violations of the

CABO Code and the second cited violations of the BOCA Building Code. While the substance of the three notices is the same (that the nails holding down the roof shingles were too short and that the flashing was of insufficient weight), the record is silent as to why the building inspector issued the second notice pursuant to the BOCA Building Code where the alleged violations related to the construction of a single family dwelling house.

It is well settled that where there is a specific enactment and a general enactment, and the general enactment includes what is embraced in the former, the particular enactment is operative and the general enactment governs only such cases within its general language as are not within the provisions of the specific enactment. *See Lumbermen's Mut. Casualty v. Ins. Comm'r*, 302 Md. 248, 268–69, 487 A.2d 271, 281–82 (1985) and cases cited therein. It follows that Passnault is being held to answer for an alleged violation of § R–803 of the CABO Code. Accordingly, the instant case is governed by the specific provisions of the CABO Code as they relate to one and two family dwellings, and the general provisions of the BOCA Building Code, not in conflict with the specific provisions of the CABO Code, as they relate to all buildings and structures.

IV

The essential issue is whether the Department has the authority to compel the vendor or builder of a dwelling house constructed in violation of the County Building Code to abate the violation some five years after the property is sold to a third party.

Passnault's basic argument is that the Prince George's County Housing Code (County Housing Code),[7] rather than the County Building Code, governs the instant case. Passnault contends that once the Department has issued a

---

7. The 1964 BOCA Basic Housing Code is adopted and incorporated by reference in Subtitle 13, entitled "Housing," of the Prince George's County Code. P.G. County Code § 13–101 (1983, 1984 Supp.).

certificate of use and occupancy, the Department's authority to issue a notice of violation for a subsequently discovered violation is derived from the County Housing Code. Because a notice of violation of the County Housing Code is properly served upon the "owner or occupant" of a noncompliant structure, P.G. County Code § 13–114 (1983, 1984 Supp.), Passnault reasons that the Department is without authority to compel him to abate the violation five years after he conveyed the property to the present owners. Passnault points to § 119.6 of the BOCA Building Code in support of this contention.

■ Section 119.6 states, *inter alia,* that the use and occupancy permit "shall certify compliance with the provisions of [the County Building] Code and the purpose for which the building or structure may be used in its several parts." Passnault suggests that it follows from § 119.6 that upon certification of compliance with the County Building Code, as evidenced by the use and occupancy permit, the Department's source of authority to issue a notice of violation shifts from the County Building Code to the County Housing Code. We are not persuaded.

First, the County Housing Code regulates subjects different in kind from the County Building Code. Items covered in the County Housing Code include minimum space per occupant, lighting and ventilation requirements, and specific sanitary and heating facilities. The County Housing Code neither contains specifications for nail length and flashing weight nor incorporates the County Building Code by reference. *See* P.G. County Code § 13–107 (1983, 1984 Supp.).

Second, the County Housing Code applies only to structures used for human habitation. *Id.* at § 13–106.2. Under Passnault's suggested approach, an office or other structure not used for human habitation which is constructed in violation of the County Building Code and which is issued a certificate of use and occupancy is not subject to the prohibitions of either the County Building Code or the County Housing Code. Following Passnault's line of reasoning, a

non-compliant office building which is mistakenly issued a certificate of use and occupancy is not subject to the County Building Code because the use and occupancy permit has been issued and is not subject to the County Housing Code because the structure is not used for human habitation. We decline to adopt a rule which would render structures not used for human habitation unregulated once the Department has issued a certificate of use and occupancy.

We thus reject Passnault's contention and rely instead on the express provisions of the County Building Code. As previously set forth, § 117.2 of the BOCA Building Code provides:

> The building official shall serve a notice of violation or order on the *person responsible* for the erection, construction, alteration, extension, repair, removal, demolition, use or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation. (Emphasis supplied).

Under § 117.2, service is proper upon the person responsible for: (1) acts done in violation of the code; (2) acts done in violation of a detail statement or plan approved thereunder; or (3) acts done in violation of a permit or certificate issued thereunder. The term "person" includes "a corporation or co-partnership as well as an individual," BOCA Building Code § 201.3 (1984), and the term "responsible" is not defined. Undefined terms "shall have the ordinarily accepted meanings or such as the context may imply." *Id.*

It is readily apparent that the three disjunctive subjects of service coupled with the breadth of the ordinary meaning of the term "responsible," results in "person responsible" including, among others: the owner of the real property at the time the wrongful act occurs; the owner when the wrongful act is discovered; the occupant, if any, of the dwelling house when the wrongful act is discovered; and

the builder, his or her agents, and any other person who works pursuant to a plan, permit, etc. issued by the Department. Section 117.2 contains neither temporal limits nor limits upon the County's discretion to determine which actor is the "person responsible."

█ We find, however, an express limitation in another provision of the BOCA Building Code.[8] As a local addition to the BOCA Building Code, Prince George's County enacted § 119.1.1, P.G. County Code § 4–113 (1983, 1984 Supp.) which states:

> Prior to the consummation of the sale (settlement) of any new, one-family dwelling, including the sale of a new condominium unit or a converted condominium which is offered for sale for the first time, there shall be an inspection of the unit and premises by the Building Official and a certificate of use and occupancy issued or a list of the violations or deficiencies requiring correction prior to issuance of such certificate. At the time of consummation of such sale, the certificate of use and occupancy, or a list of the deficiencies or violation which remain to be corrected prior to issuance of such certificate, shall be presented to the buyer. Unless contractually relieved of such responsibility, the seller shall be responsible for correction of any violations or deficiencies necessary for the certificate to be issued. When a certificate of use and

---

**8.** We also are compelled to observe some inherent limits on the Department's authority to enforce the provisions of the Building Code. Chartered counties have only such powers as are expressly granted or reasonably implied therefrom. *See Barlow v. Friendship Heights,* 276 Md. 89, 93–94, 344 A.2d 415, 417 (1975) (quoting 1 J. Dillon, *Municipal Corporations* § 89 at 145 (4th ed. 1890)) and cases cited therein. *See also Smith v. Edwards,* 292 Md. 60, 437 A.2d 221 (1981). The power to hold an owner or builder of a dwelling house liable in perpetuity for compliance with the Building Code is an extraordinary power not fairly implied from the express power to enact local laws relating to the "erection, construction, repair and use of buildings and other structures." Maryland Code (1957, 1981 Repl. Vol.), Art. 25A, § 5(T). Further, we note, without deciding, that the County's authority to issue a notice of violation may extend only so long as the County may proceed in equity to enjoin the violation or so long as the wrongdoer may be subject to criminal prosecution.

occupancy has not been issued prior to consummation of the sale, there shall be required a separate, written contractual agreement indicating responsibility for correction of all deficiencies or violations cited by the Department by a date certain. The provisions of this Subsection are not applicable when a new dwelling unit is purchased for resale as a new dwelling unit.

■ As we read § 119.1.1, unless contractually relieved of responsibility by the purchaser, the vendor is responsible for all *issued* notices of violation at the time of settlement and such liability exists whether the notices have been issued to the vendor, occupant, builder or other person upon whom service is proper. Implicit in § 119.1.1 is that the responsibility of the vendor, and those acting by, through, or under the vendor, terminates at settlement and the purchaser is responsible for notices of violation issued subsequent to the transfer of title.

■ Our interpretation of § 119.1.1 is buttressed by § 13–103 of the County Housing Code:

*Responsibility of seller for violations.*

The seller of a dwelling structure and premises shall be responsible for compliance with all issued notices of violations of this Subtitle *or other laws of the County,* or actions in any court on account of such violations, against or affecting the property at the date of execution of any agreement of sale or transfer of ownership of such dwelling structure and premises. Nothing contained in this Subtitle shall affect the validity of any sale, transfer or disposition of any interest in real estate. (Emphasis supplied).

Accordingly, we hold that after legal title passes from the vendor to the purchaser, the purchaser of the dwelling house is the "person responsible" under § 117.2 of the BOCA Building Code.[9]

---

9. While it is clear that the purchaser may not be held responsible for the erection, construction, etc. of a non-compliant dwelling house, the

In the instant case, Passnault transferred title to the property to the Bryants in 1979. The Department issued the notices of violation in 1984. *A fortiori*, Passnault is no longer the "person responsible" for the violation and the County is without authority to compel Passnault to abate the violation.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY APPELLEE.

APPENDIX A

BOCA BASIC BUILDING CODE, ART. 1, Administration and Enforcement (1984)

*SECTION 117.0 VIOLATIONS*

*117.1 Unlawful acts:* It shall be unlawful for any person, firm or corporation to erect, construct, alter, extend, repair, remove, demolish, use or occupy any building or structure or equipment regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

*117.2 Notice of violation:* The building official shall serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, removal, demolition, use or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation.

---

purchaser may be cited for the maintenance of a dwelling house in violation of the County Building Code. *See* CABO Code § R–106.1 at Appendix B. The purchaser may have, however, a direct cause of action against a vendor who has conveyed a dwelling house constructed in violation of the Building Code. *See* Maryland Code (1974, 1981 Repl.Vol.), Real Property Article § 10–201 *et seq.; Loch Hill Constr. Co. v. Fricke,* 284 Md. 708, 399 A.2d 883 (1979).

*117.3 Prosecution of violation:* If the notice of violation is not complied with promptly, the building official shall request the legal counsel of the jurisdiction to institute the appropriate proceeding at law or in equity to restrain, correct or abate such violation or to require the removal or termination of the unlawful use of the building or structure in violation of the provisions of this code or of the order or direction made pursuant thereto.

*117.4 Violation penalties:* Any person who shall violate a provision of this code or shall fail to comply with any of the requirements thereof or who shall erect, construct, alter or repair a building or structure in violation of an approved plan or directive of the building official, or of a permit or certificate issued under the provisions of this code, shall be guilty of a [*specify offense*], punishable by a fine of not more than [*amount*], or by imprisonment not exceeding [*number of days*], or both such fine and imprisonment. Each day that a violation continues shall be deemed a separate offense.

*117.5 Abatement of violation:* The imposition of the penalties herein prescribed shall not preclude the legal officer of the jurisdiction from instituting appropriate action to prevent unlawful construction or to restrain, correct or abate a violation, or to prevent illegal occupancy of a building, structure or premises or to stop an illegal act, conduct, business or use of a building or structure on or about any premises.

## APPENDIX B

CABO ONE & TWO FAMILY DWELLING CODE, Part 1, Administrative (1985)

SECTION R–106—Violations and Penalties

*R–106.1—Unlawful Action.* It shall be unlawful for any person, firm, or corporation whether as owner, lessee, sublessee or occupant to erect, construct, enlarge, alter, repair, improve, remove, convert, demolish, equip, use, occupy, or maintain any one and two family dwelling in the jurisdiction

or cause or permit the same to be done, contrary to or in violation of any of the provisions of this Code.

*R–106.2—Violations.* It is hereby declared that any violation of this Code constitutes a public nuisance, and in addition to any other remedies provided by this Code for its enforcement, the City may bring civil suit to enjoin the violation of any provisions of this Code.

If for any reason any one or more sections, sentence clauses or parts of this Code are held invalid, such judgment shall not affect, impair or invalidate the remaining provisions.

*R–106.3—Penalty.* Any person, firm or corporation violating any of the provisions of this Code shall be guilty of a misdemeanor and each such person shall be deemed guilty of a separate offense for each and every day or portion thereof during which any violation of any of the provisions of this Code is committed, continued or permitted, and upon conviction of any such violation such person shall be punishable by a fine, or by imprisonment, or by both such fine and imprisonment as established by local applicable laws.

ELDRIDGE, Judge, dissenting.

The Court holds that in Prince George's County a purchaser, and not the builder, bears sole responsibility for correcting building code violations discovered after settlement. According to the majority, conveyance of title terminates the responsibility of a builder who sells a house which he built in violation of the building code. I disagree with this interpretation of the Prince George's County Code, and therefore I dissent.

In my view, § 117.2 of the BOCA Basic Building Code, adopted by reference in Prince George's County Code § 4–114 (1983, 1985 Supp.), is applicable to this case. Section 117.2 unambiguously states as follows:

"117.2 Notice of violation: The building official shall serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, removal, demolition, use or occupancy of a build-

ing or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation."

Under the clear language of § 117.2, the "person responsible for the erection [or] construction ... of a building or structure in violation of the [building] code" is subject to a notice of violation and an order directing "the abatement of the violation." Passnault, as the contractor named on the building permit, is the person responsible for the construction of the defective house in this case. Therefore, the Prince George's County Building Inspector acted entirely in accordance with the mandate of § 117.2 when he issued violation notices and orders to Passnault.

Nevertheless, the majority concludes that § 117.2 is not applicable to this case. Instead, the Court applies § 4-115.1 of the Prince George's County Code (1983, 1985 Supp.).[1] Section 4-115.1 amends § 119.1 of the BOCA Basic Building Code as follows:

"(1) A new Subsection 119.1.9, titled "New One-Family Dwelling Units", is added to read as follows: Prior to the consummation of the sale (settlement) of any new, one-family dwelling, including the sale of a new condominium unit which is offered for sale for the first time, there shall be an inspection of the unit and premises by the Building Official and a certificate of use and occupancy issued or a list of the violations or deficiencies requiring correction prior to issuance of such certificate. At the time of consummation of such sale, the certificate of use and occupancy, or a list of the deficiencies or violation

---

1. I note that the Court cites this section as § 4-113 of the Prince George's County Code (1983, 1984 Supp.). By Council Bill No. 121 of the 1985 Legislative Session, the County Council of Prince George's County repealed § 4-113. A substantially identical provision was enacted by the same Council Bill as § 4-115.1 of the 1985 Supplement to the County Code.

which remain to be corrected prior to issuance of such certificate, shall be presented to the buyer. Unless contractually relieved of such responsibility, the seller shall be responsible for correction of any violations or deficiencies necessary for the certificate to be issued. When a certificate of use and occupancy has not been issued prior to consummation of the sale, there shall be required a separate, written contractual agreement indicating responsibility for correction of all deficiencies or violations cited by the Department by a date certain. The provisions of this Subsection are applicable when a new dwelling unit is purchased for resale as a new dwelling unit."

The majority opinion states that § 119.1.9 is an "express limitation" on § 117.2. The opinion proceeds to interpret § 119.1.9 as limiting the responsibility of the vendor to those building code violations issued at or before the time of settlement. Without further explanation, the majority then concludes: "Implicit in § 119.1[.9] is that the responsibility of the vendor, and those acting by, through, or under the vendor, terminates at settlement and the purchaser is responsible for notices of violation issued subsequent to the transfer of title."

I reject the majority's determination that § 119.1.9 is an "express limitation" on § 117.2. Section 117.2 by its terms applies to the persons "responsible for the erection, construction, alteration, extension, repair, removal, demolition, use or occupancy" of a house in violation of the building code. It does not mention "buyer" or "seller," and applies regardless of whether the person responsible is a buyer or seller or neither. Section 119.1.9, however, applies only to "buyers" or "sellers." Both sections are specific in their language; they clearly apply to distinct situations. It is true that a particular set of circumstances may involve both types of situations, *e.g.,* where one is both the builder of a house and the seller of the real estate. Nevertheless, the thrust of each statute is different, and neither operates as an express limitation on the other.

The majority's interpretation belies the clear language of § 119.1.9. As pointed out above, § 119.1.9 applies to "sellers" and "buyers." The majority relies upon this section to conclude that Passnault, the seller, is not responsible for violations when notices are issued after settlement. Passnault, however, wears two hats; he also *built* the house that he sold. Therefore, while § 119.1.9 may relate to Passnault's responsibility as seller of the house, it in no way relates to Passnault's liability as builder of the house.

Furthermore, by its terms, § 119.1.9 deals only with notices of building code violations issued prior to the settlement and deals only with new one-family dwellings. It says nothing about the responsibility for violation notices issued at other times or for structures other than new one-family dwellings.

For similar reasons, the majority has misplaced its reliance upon § 13–103 of the County Housing Code. Passnault, a builder, was cited for building code, not housing code, violations. Section 13–103 of the Housing Code expressly deals with a seller's responsibility for "all issued notices of violations ... against or affecting the property at the date of execution of any agreement of sale or transfer of ownership of such dwelling structure and premises." Like § 119.1.9, this housing code provision deals only with a *seller's* liability for notices of violations issued *before* the execution of a contract for sale of the structure.

Despite the absence of statutory language expressly supporting the majority's position, the majority asserts that it is *implicit* in § 119.1.9 that Passnault is not responsible for violations when notices are issued after settlement and authorized by § 117.2. I disagree. This implication is totally inappropriate in light of the differences in the pertinent statutes. An ordinance that deals with the *seller's* responsibility for violation notices, issued *prior to settlement,* concerning *new one-family dwellings,* does not necessarily imply anything at all about the responsibility of a *builder,* for notices *whenever issued,* concerning *any buildings* or structures that may have been constructed,

altered, repaired, removed, etc. *See* 2A Sutherland Statutory Construction § 55.03 (4th ed. 1984) ("A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed.") This is especially true when there is a specific county code provision plainly covering violation notices issued to a builder at any time and covering a broad range of structures, namely § 117.2.

The Petitioner Passnault, in his effort to circumvent the plain language of § 117.2, argues that it would be "unreasonable" to adopt a construction that would allow "the County to return to a builder decades after the County's final inspection, issuance of use and occupancy permits and actual sale of the property. The County's interpretation makes the builder forever a guarantor ... that the property was originally built pursuant to the specifications of the then existent Building Code." (Petitioner's Brief, p. 24). The answer to this argument is that a builder in this position would have available the defense of laches.[2]

The equitable defenses of estoppel and laches are often available against a municipality. See Judge McAuliffe's recent discussion of this matter for the Court in *Permanent Fin. Corp. v. Montgomery Cty.*, 308 Md. 239, 247–253, 256, 578 A.2d 123 (1986), and cases cited therein. In the hypothetical case contemplated by Passnault's argument, laches would be applicable, as it seems reasonable for a builder 1) to rely upon a certificate of use and occupancy and 2) to assume that any building code violations would be reported within a reasonable time after a use and occupancy certificate is issued. Therefore, if it were claimed that the County waited too long to issue a notice of violation, and if

---

2. The answer given in the majority opinion will avail a builder if he is also the vendor and the structure is a new one-family dwelling. It will not, however, assist any other builder.

all of the prerequisites to the defense of estoppel or laches were satisfied, the County's action would be barred.[3]

It is not an "unreasonable" construction to give effect to the plain meaning of § 117.2 and hold a builder responsible for his violations of the building code under notices served after settlement, particularly considering the availability of the laches defense. In fact, this result is entirely reasonable, as many violations of the code will not be apparent upon final inspection and before occupancy. Some types of violations may be latent and not reasonably discoverable until after occupancy.

In this case, the decisions of the administrative agency, the circuit court and the Court of Special Appeals were in accord with the clear language of the pertinent statutory provisions. Therefore I would affirm.

Judges COLE and ADKINS have authorized me to state that they concur with the views expressed herein.

---

**3.** In the instant case, the Petitioner Passnault has expressly and strenuously disclaimed reliance upon defenses such as limitations, laches and estoppel; instead, his argument has been based entirely upon statutory construction and "jurisdiction" under the pertinent statutes as construed. (Petitioner's Brief, pp. 11-16, 21-22).