552 A.2d 1371

**Holly Madeline DOUGLASS**

v.

**STATE of Maryland.**

**No. 789, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 7, 1989.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender on the brief) Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty.

for Montgomery County, Rockville, on the brief), for appellee.

Submitted before GILBERT, C.J., and WILNER and ROSALYN B. BELL, JJ.

WILNER, Judge.

Md.Ann.Code art. 27, § 287(b) makes it unlawful for any person

> "To obtain or attempt to obtain a controlled dangerous substance ... or to procure or attempt to procure the administration of any controlled dangerous substance by (1) fraud, deceit, misrepresentation or subterfuge, or (2) by the forgery or alteration of a prescription or a written order, or (3) by the concealment of any material fact or by the use of false name or address, or (4) by falsely assuming the title of or representing himself to be a manufacturer, distributor or practitioner, or (5) by making or uttering any false or forged prescription or written order."

Essentially at issue in this appeal is whether the acts proscribed by subsection (b)(2) and (3) are also subsumed in the proscription of subsection (b)(1)—i.e., whether the alteration of a prescription or the use of a false name to obtain a controlled dangerous substance will support a conviction for obtaining or attempting to obtain such substance by "fraud, deceit, misrepresentation or subterfuge." We shall answer in the negative and therefore reverse the judgment entered against Holly Madeline Douglass by the Circuit Court for Montgomery County.

## Factual Setting

On June 5, 1987, Ms. Douglass, a Virginia resident, appeared in the emergency room of Georgetown University Hospital in the District of Columbia complaining of symptoms indicative of an upper respiratory infection. The attending physician examined her and, apparently satisfied that her complaints were legitimate, gave her a prescription

for Tussionex, a cough medicine that is classified as a controlled dangerous substance under Schedule III, Md. Ann.Code art. 27, § 279(c). The doctor prescribed this particular drug after Ms. Douglass reported a codeine allergy. Ms. Douglass gave the physician a false name and address, Deb Engelhard of Knoxville, Tennessee, and the prescription was written in that name.

Accompanied by a friend, Jeffery, Ms. Douglass presented the prescription at a pharmacy in Gaithersburg, Maryland. The prescription as presented purported to authorize the dispensing of sixteen ounces of Tussionex. There is considerable dispute, however, over whether the doctor originally prescribed anything more than six ounces. The doctor could not recall the details concerning how much of the drug he prescribed. He testified, however, that Tussionex was usually prescribed in six-ounce quantities and that he never knowingly prescribed, nor would he prescribe, sixteen ounces of the addictive drug. There is, in other words, a fair inference that Ms. Douglass altered the prescription by increasing the prescribed dosage. The pharmacy initially dispensed four ounces of the drug, as Ms. Douglass requested.

In the ensuing week, the pharmacy placed the "Engelhard" prescription under close scrutiny. A store pharmacist and the attending physician testified that a prescription for sixteen ounces of a narcotic that was normally dispensed in four- or six-ounce quantities would naturally arouse suspicion. In addition, an unidentified person telephoned in a refill request on June 11, at a different store in the same chain of pharmacies, giving a different address and telephone number from that written on the prescription. Although this refill was never picked up, there was testimony that Jeffery went to that store and waited for the refill but left "because it was taking too long."

On June 14, Ms. Douglass appeared at the original drug store and asked for a refill of "Debbie Inglehart['s]" prescription. She claimed that her friend Debbie had called in a refill request a few days earlier and that she was there to

pick it up. Because the prescription was under surveillance
by the pharmacy, the store pharmacist called the police.
Upon their arrival, Ms. Douglass said that she had obtained
the prescription "from a woman outside the pharmacy who
asked her to get it filled for her."

Unpersuaded, the police placed Ms. Douglass under ar-
rest and charged her, in the District Court, with (1) "Ob-
tain[ing] A CDS Of Schedule III, To Wit: Tussionex By The
Use of A False Name And Address," (2) "Obtain[ing] A
CDS Of Schedule III, To Wit: Tussionex, By Fraud, Deceit,
Misrepresentation and Subterfuge," and (3) "Att[empting]
To Obtain A CDS of Schedule III, To Wit: Tussionex, By
Fraud, Deceit, Misrepresentation And Subterfuge," all in
violation of art. 27, § 287. Upon Ms. Douglass's prayer for
jury trial, the case was transferred to the Circuit Court.
The State was content to proceed on the charging document
filed in the District Court. *See* Md. Rule 4–201(c)(3).

### The Issue

Even before trial commenced, Ms. Douglass more or less
conceded that she had given a false name and address to
the prescribing physician. She argued, however, then and
at the conclusion of the evidence, that the State had no
evidence that the doctor ever relied upon that false informa-
tion in issuing the prescription and that reliance was an
essential element of the fraud charge. That question be-
came particularly well crystallized when, at the end of its
case, the State, offering no explanation, *nol prossed* the
first count of the charging document—obtaining a CDS by
the use of a false name and address—and elected to proceed
solely on the "fraud, deceit, misrepresentation and subter-
fuge" charges. Throughout, however, the court seemed to
view the proscriptions of subsection (b)(3), and, by implica-
tion, those of subsection (b)(2) as well, as incorporated in
subsection (b)(1). In response to Ms. Douglass's argument,
the court declared

"[T]he gravamen of the offense is the actual use of a
false name, and false address. Whatever the hidden

agenda of the Defendant was is not a concern of the State, in my view.

Whatever mental reservation the Defendant may have held to herself for reasons that she would not give her correct name and address, is not something that the State has to concern itself with by either negating, or proving up the contrary in some fashion, in its' [sic] case in chief.

I am ruling specifically that all the State needs to show is what it has shown in this case, that there was a false name imprinted upon there, on this prescription, that was created by the Defendant.

That she then went to a drugstore and obtained drugs by the use of that prescription."

Its instructions to the jury followed that assumption: "The Defendant is charged in this matter in two counts. In the first count she is charged with obtaining a controlled dangerous substance by fraud, deceit, misrepresentation, or subterfuge. That is on the date of June 5, 1987.

In the second count she is charged with the attempt to do the same thing, and that is on the date of June 14, the date that she was arrested.

.     .     .     .     .

Now, I am going to instruct you on the law as it applies to the particular charges involved. First let me start with the date of June 5, 1987. That is the date upon which the State is charging the Defendant of [sic] obtaining the controlled dangerous substance by the use of fraud, deceit, misrepresentation, or subterfuge. The law in Maryland is as follows:

It is unlawful for any person to obtain or attempt to obtain a controlled dangerous substance, or controlled paraphernaila [sic], or to procure, or attempt to procure the administration of any controlled dangerous substance by, one, fraud, deceit, misrepresentation, or subterfuge; or two, by the concealment of any material facts, or by the use of false name or address.

The second count that the State is going on, is that on the date of June 14, 1987, that the Defendant, Holly Douglass, attempted to commit the crime that I have just defined for you."

The State's view of the law was argued succinctly to the jury, as the prosecutor told the panel:

"First of all, the fact that she may or may not have been validly entitled to this Tussionex, if she had not given a phony name, is completely irrelevant. So what?

The Judge has already told you that the mere giving of the phoney name is a violation of the law. Any fraudulent act that you do to obtain a controlled dangerous substance is a violation of the law.

The legislature has mandated that. It is written down in the books. I have it right here. The Judge has it, and [Defense Counsel] has it. He knows that. There is no doubt about that."

The jury convicted Ms. Douglass on both charges. From the judgment entered on those convictions, she has brought this appeal pressing her statutory construction argument and contending that (1) the evidence was insufficient to sustain her convictions and (2) the trial court erred "in not instructing the jury as to materiality or causation and in prohibiting defense counsel from arguing those matters to the jury."

*Discussion*

██ Although appellant's argument focuses on the element of reliance, which is normally an essential ingredient in a charge of fraud, her complaint as to the sufficiency of the evidence raises as well the somewhat broader issue of whether, in light of the specific proscriptions stated in § 287(b)(2) and (3), the obtention or attempt to obtain a controlled dangerous substance solely through alteration of a prescription or use of a false name or address can support a conviction under § 287(b)(1). That is the issue we shall consider, because it is determinative.

The issue is one of statutory construction, of course, and would seem rather clearly to be controlled by the principle, well established in Maryland, that "where there is a specific enactment and a general enactment, and the general enactment includes what is embraced in the former, the particular enactment is operative *and the general enactment governs only such cases within its general language as are not within the provisions of the specific enactment.*" (Emphasis added.) *Passnault v. Board of Admin. Appeals*, 309 Md. 466, 475, 525 A.2d 222 (1987); *see also Lumbermen's Mut. Casualty v. Ins. Comm'r*, 302 Md. 248, 268–69, 487 A.2d 271 (1985); *Criminal Inj. Comp. Bd. v. Gould*, 273 Md. 486, 494–95, 331 A.2d 55 (1975). Under this doctrine, or rule of construction, the conduct specifically proscribed by subsections (b)(2) through (5) would be regarded as excluded from the ambit of subsection (b)(1), even though, but for the specific proscriptions, it would fall within the reach of that general offense.

We need not rest our decision on so important an issue merely upon a general rule of construction, however. An examination of the history of § 287(b) convinces us that the legislative intent, which is in all cases the controlling factor, is in complete harmony with that rule of construction and so gives it a special validity and significance in this case.

Section 287(b) of art. 27 is ultimately derived from the Uniform Narcotic Drug Act, approved by the National Conference of Commissioners on Uniform State Laws and Proceedings in 1932. Prior to the State's adoption of that Act, the law on narcotic drugs, codified in Md.Ann.Code art. 27, §§ 283—291 (1924), made it unlawful for any person to dispense certain enumerated drugs "except upon the original written order or prescription of a lawfully authorized practitioner of medicine, dentistry or veterinary medicine of good standing in his profession, not of intemperate habits or addicted to the use of any drugs...." It prohibited anyone other than a licensed physician, dentist, veterinarian, chemist, or pharmacist from possessing those drugs "with intent to sell, give away or otherwise dispose of the

same" and made it unlawful for physicians and dentists to prescribe or furnish these drugs "except to such person who are under his care and for whom he, in good faith, prescribed as necessary for their professional treatment...." The law required that prescriptions be in writing, that they be dated, that they contain the name of the person for whom prescribed, and that they be permanently retained on file by the person dispensing the drugs. The requirements and prohibitions, in other words, seem to have been placed on the prescribers and dispensers of the drugs, rather than on persons attempting to obtain them.

Many States had laws of this type, but there was no uniformity among them, and few dealt specifically with the obtaining of prescriptions or drugs by fraud or deception. *See* Report to National Conference of Commissioners on Uniform State Laws (National Conference) by Committee on Uniform Drug Law, August, 1920, *Handbook of the National Conference* 236–43 (1920). Eventually, after 15 years of consideration and five tentative drafts, the Conference, in 1932, approved and recommended to the States a Uniform Narcotic Drug Act containing a section (§ 17) on fraud and deceit. *See 1932 Handbook* at 322–23. Maryland adopted the Uniform Act in 1935. *See* 1935 Md. Laws, ch. 59. Section 17 of the Uniform act became § 285Q of Md.Ann.Code art. 27, as follows:

"No person shall obtain or attempt to obtain a narcotic drug, or procure or attempt to procure the administration of a narcotic drug (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by the forgery or alteration of a prescription or of any written order; or (c) by the concealment of a material fact; or (d) by the use of a false name or the giving of a false address.

(a) Information communicated to a physician in an effort unlawfully to procure a narcotic drug, or unlawfully to procure the administration of any such drug, shall not be deemed a privileged communication.

(b) No person shall wilfully make a false statement in any prescription, order, report, or record, required by this sub-title.

(c) No person shall, for the purpose of obtaining a narcotic drug, falsely assume the title of, or represent himself to be, a manufacturer, wholesaler, pharmacist, pharmacy owner, physician, dentist, veterinarian, or other authorized person.

(d) No person shall make or utter any false or forged prescription or written order.

(e) No person shall affix any false or forged label to a package or receptacle containing narcotic drugs."

This was, in a number of respects, a peculiarly organized and drafted statute. The introductory paragraph, which really is the major provision, is not clearly denominated as a separate subsection as are the others and, indeed, uses an internal lettering system similar to the system used to denominate separate subsections. That paragraph also, of course, separately states acts that normally would be regarded as falling within the ambit of the "fraud, deceit, misrepresentation, or subterfuge" language.

There is no recorded evidence that we could find indicating why the first paragraph of the statute was worded that way. The seeds of the apparent redundancy appear in the First Tentative Draft of the section considered by the National Conference in 1925, *see 1925 Handbook* at 983, and they remained, and indeed blossomed, in the subsequent drafts.[1] Nor is there any recorded discussion among

---

1. In the First Tentative Draft, § 17 stated, in relevant part:

   "Any fraud, deceit, misrepresentation, subterfuge, concealment of a material fact or the use of a false name or the giving of a false address in obtaining treatment in the course of which habit forming drugs shall be prescribed or dispensed or in obtaining any supply of such drugs shall constitute a violation of the provisions of this Act and shall not be deemed a privileged communication. The wilful making of any false statement in any prescription, order, report, or record required under this Act shall constitute a violation of this Act."

either the Commissioners on Uniform State Laws or the committees or members of the 1935 Maryland General Assembly as to (1) why it was felt necessary to make special mention of acts of forgery, concealment, and using a false name or address, (2) whether those acts were intended to be independent offenses, separate and apart from "fraud, deceit, misrepresentation, or subterfuge," or (3) whether a charge of "fraud, deceit, misrepresentation, or subterfuge" could be sustained by proof of one of the other acts enumerated in the paragraph.

Although one might think that questions would have arisen in this regard once the law was in place, it appears that they did not, at least in Maryland. The closest we came was in *Goodman v. State*, 237 Md. 64, 205 A.2d 53 (1964), where the defendant obtained a prescription for a narcotic drug by falsely representing both his identity and his physical condition to a physician. He not only gave a false name but also gave "the false impression that he was suffering from some kidney disturbance." *Id.* at 65, 205 A.2d 53. See also briefs filed in that case (S.T.1964, No. 88). He was charged under the then-current version of § 285Q with obtaining the drug "by a certain misrepresentation," but the question of whether that charge sufficed substantively was not addressed by the Court. Although Goodman got the prescription in Maryland, he had it filled in the District of Columbia, and so the Court concluded that,

---

This was, in turn, based largely on a New York statute, the Second Whitney Act, 1918 N.Y. Laws, ch. 639. *See 1925 Handbook* at 975. The specific proscription of "forgery or alteration of prescription or written orders" was introduced in the Third Tentative Draft considered in 1929 and 1930. *See 1929 Handbook* at 339; *1930 Handbook* at 495–96. That Third Tentative Draft also recast the language of the introductory paragraph of § 17 closer to its present form. The Fifth (and final) Tentative Draft of § 17 made that introductory paragraph a clear separate subsection—subsection (1). It stated:

"(1) No person shall obtain or attempt to obtain a narcotic drug, or procure or attempt to procure the administration of a narcotic drug, (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by the forgery or alteration of a prescription or of any written order; or (c) by the concealment of a material fact; or (d) by the use of a false name or the giving of a false address."

as the offense charged was the unlawful *obtention* of the drug, it was not committed in Maryland and the State was therefore without jurisdiction to try it.

Other States that adopted the Uniform Narcotic Drug Act seem to be equally lacking in definitive rulings on the issue, but it does appear that, where the gravamen of the offense was the use of a false name or address or the presenting of a forged prescription, that specific proscription was usually charged, sometimes in addition to the more general provision precluding obtention of the drug by fraud. *See, for example, State v. Scarborough,* 170 So.2d 458 (Fla.App. 1965); *People v. Wood,* 127 Cal.App.2d 770, 274 P.2d 453 (1954); and *cf. Hill v. State,* 266 P.2d 979 (Okla.Cr.App. 1954); *State v. Harkness,* 1 Wash.2d 530, 96 P.2d 460 (1939). In some instances, a charge of obtaining or attempting to obtain drugs by fraud, deceit, or misrepresentation was sustained *in part* by evidence that the defendant had used a false name or address, but in those cases the use of a false name or address was only part of a much more pervasive scheme of fraud, usually involving bogus prescriptions or fictional doctors. *See, for example, People v. Henry,* 86 Cal.App.2d 785, 195 P.2d 478 (1948); *State v. Logan,* 59 Nev. 24, 83 P.2d 1035 (1938); *State v. Crawford,* 251 S.W.2d 76 (Mo.1952).

In *State v. Newstead,* 280 S.W.2d 6 (Mo.1955), the defendant was charged, under a statute virtually identical to that now before us, with obtaining a drug by using a false name and address. The evidence at trial supported that charge. Unfortunately, the jury, perhaps misled by an instruction that "did not clearly confine itself to the charge of obtaining a narcotic drug by use of a false name and address, but contained much that was surplusage," *id.* at 11, found the defendant guilty of "procuring drugs by means of fraud, as charged...." Although no objection, either to the instruction or the verdict, was made below, on appeal Newstead attacked the verdict as being non-responsive.

The Missouri Court held that the statute made it a "separate offense" to obtain a drug by using a false name

or address, *id.* at 9, and that "the amended information did not charge defendant with fraud or deceit in obtaining narcotic drugs (although such could have been charged under the same first subdivision of [the statute] as obtaining a narcotic drug by use of a false name and address was charged)." Thus, the Court concluded that "[t]he verdict was not technically responsive to the charge...." *Id.* at 11. The Court sustained the verdict anyway, however, finding, "upon a review of the whole record, that it is clear enough that the jury intended to and did find defendant guilty of obtaining a narcotic drug by the use of a false name and address as charged...." *Id.*

In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970 (P.L. 91–513). In § 403(a)(3) of that Act (21 U.S.C. § 843(a)(3)), it collapsed the separately described fraud provisions of the Uniform Act and simply made it unlawful for any person "knowingly or intentionally ... to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge."

Obviously keeping a close eye on the Congressional undertaking, the Commissioners on Uniform Laws, promptly upon passage of the Federal Act, drafted and recommended to the States a new Uniform Controlled Substances Act, to replace the 1932 Uniform Narcotic Drug Act. The new Uniform Act, the Commissioners stated, "was drafted to achieve uniformity between the laws of the several States and those of the Federal government." *1970 Handbook* at 113, 223; *State v. One 1984 Toyota Truck,* 311 Md. 171, 177, 533 A.2d 659 (1987). In conformance with that purpose, the fraud provision was rewritten *identically* to the Federal counterpart. *See* Uniform Controlled Substances Act § 403(a)(3); 9 U.L.A. 588 (1988).

Maryland very promptly adopted some parts of the new Uniform Act. *See* 1970 Md. Laws, ch. 403. One feature that was *not* adopted, however, was the rewritten fraud provision. Instead, the Legislature opted to retain the format of the preexisting law, now embodied in § 287(b).

The decision to retain in the law separate, and separately enumerated, proscriptions of specific conduct when considering, and largely adopting, a Uniform Act that had merged that conduct was obviously deliberate and must be regarded as significant. The Legislature may have been concerned that a merger of the specific conduct into one general fraud offense might actually circumscribe the conduct or impede prosecution of it by requiring the State to prove that the conduct was willful or that, in the case of a completed transaction, there was reliance on the false statement. As we pointed out in *Greco v. State,* 65 Md.App. 56, 66, 499 A.2d 209 (1985), *aff'd* 307 Md. 470, 515 A.2d 220 (1986), courts "have been reluctant to define fraud with any degree of preciseness," and there do abound in the various definitions requirements of reliance and willfulness. *See, for example, Suburban Mgmt. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326 (1964); *Greco, supra,* 65 Md.App. at 66, 499 A.2d 209; *B.N. v. K.K.* 312 Md. 135, 538 A.2d 1175 (1988). As separately stated, however, that conduct may be punishable without a showing of reliance or willfulness.

This is not an unreasonable supposition. Although a number of courts have since held that the fraud offense stated in § 403(a)(3) does not necessarily require a showing of reliance, that development was not so clearly predictable in 1970; nor, indeed, is it universal. *See Robinson v. State,* 678 P.2d 374 (Wyo.1984); *State v. Basinow,* 121 N.H. 815, 435 A.2d 829 (1981); *State v. St. John,* 544 S.W.2d 5 (Mo.1976); and *McCutcheon v. Commonwealth,* 224 Va. 30, 294 S.E.2d 808 (1982); *but compare United States v. Bass,* 490 F.2d 846 (5th Cir.1974).

Whatever may have been the Legislature's purpose, it did clearly reject a single, all-encompassing fraud provision in favor of the existing enumerated proscriptions. If, as the State seems to believe, those other proscriptions, § 287(b)(2)–(5), are subsumed into § 287(b)(1) in any event, that clear decision would be rendered meaningless and paragraphs (2)–(5) would be relegated to the lowly status of

mere surplusage. That is not how we generally construe statutes.

The carving out and the deliberate retention of the specific proscriptions suggests rather strongly that the Legislature intended to treat them separately, as separate offenses, and not as part of § 287(b)(1). This is not like the theft statute, Md.Ann.Code art. 27, § 342, or the sexual offense statutes, art. 27, §§ 462—464C, where the Legislature created unitary offenses but set forth several ways in which those offenses can be committed. Neither § 287 as a whole nor subsection (b) in particular purports to create a unitary offense. The State, at least through its police officers, seemed to understand that in this case, for, as we indicated, Ms. Douglass was charged, and for a time prosecuted, specifically under § 287(b)(3). We shall not blithely brush aside a clear legislative decision and erase a statute from the books simply because a prosecutor acted unwisely by (1) *nol prossing* the charge under § 287(b)(3) that Ms. Douglass virtually conceded and (2) neglecting to charge a violation of § 287(b)(2) based on the evidence indicating that she had altered the dosage on the prescription.

These specific offenses are not subsumed in § 287(b)(1), and, as the evidence indicated no other type of conduct on Ms. Douglass's part that would fall within § 287(b)(1), the judgments must be reversed without retrial.

JUDGMENTS REVERSED; MONTGOMERY COUNTY TO PAY THE COSTS.