679 A.2d 1106

**Scotland Eugene WILLIAMS**

v.

**STATE of Maryland.**

**No. 89, Sept. Term, 1995.**

Court of Appeals of Maryland.

July 30, 1996.

726

Michael R. Braudes, Assistant Public Defender (Stephen E. Harris, Public Defender; Sherrie B. Glasser, Margaret L. Lanier, Michele M. Nethercott, Assistant Public Defenders, on brief), Baltimore, for Appellant.

Ann N. Bosse, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Kathryn Grill Graeff, Assistant Attorney General, on brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

This direct appeal in a capital murder case raises several issues concerning the trial of and death sentence imposed upon the Appellant, Scotland Eugene Williams. Williams was convicted by a jury in the Circuit Court for Anne Arundel County of two counts of first degree murder, multiple counts of robbery with a deadly weapon, theft, burglary, and use of a handgun in the commission of a crime of violence. After a capital sentencing hearing conducted before Judge Eugene M. Lerner, Williams received the death penalty. This appeal is before us pursuant to Maryland Code (1957, 1992 Repl.Vol., 1995 Supp.), Article 27, § 414. For reasons which we shall explain, we must reverse Williams's convictions and sentence and remand the case for a new trial.

## I. FACTS

The victims in this case, Jose Trias and his wife, Julie Gilbert, were successful attorneys who owned a weekend home in Annapolis, Maryland. On Monday, May 16, 1994, when Trias and Gilbert failed to arrive at work, their secretaries

became concerned and tried to locate them. Gilbert's secretary contacted Ricky Cole, a carpenter who frequently worked on the couple's Annapolis home and had a key to the residence, and asked him to go to the house to check on the couple. Upon arriving at the house, Cole noticed that Gilbert's Acura Legend automobile was missing, and he found a note taped to the door that said "ON *VACATION!*! BE BACK 20 MAY." Cole went into the bedroom, where he found Gilbert and Trias lying prone on their bed. Each had been fatally shot in the back of the head at close range. Both victims had been dead approximately 24 to 48 hours prior to discovery.

Among various items missing from the residence were automatic teller machine (ATM) cards belonging to Trias and Gilbert. During the period of May 15 to 17, 1994, several withdrawals and attempted withdrawals were made with the bank cards at various ATM locations. Security cameras at the ATM machines photographed Williams making some of these transactions, and photographed Williams in a car that appeared similar to Gilbert's Acura Legend. Two witnesses also testified that they saw Williams ahead of them in line at ATM machines on May 17, 1994.

Police arrested Williams on May 19, 1994, as he was leaving his mother's home in Arnold, Maryland. When arrested, Williams was carrying $2,160.85 in cash, most of it in $20 bills. He also had in his possession a brown bag containing, among other things, a canister of mace, a crow bar, a blue bandanna, and a gold watch. The watch was later identified as belonging to Gilbert. After the arrest, police searched the home of Williams's mother, where Williams had been living for about a month. During the search, police seized three small flashlights, two pair of handcuffs and a pair of binoculars.

Various items of clothing seized from the Williams residence, as well as the clothing Williams was wearing when arrested, tested positive for blood, although the source of the blood could not be determined. Additionally, fibers from a pair of brown cotton gloves found in Williams's bedroom were

consistent with fibers found on the tape securing the "on vacation" sign found at the murder scene. A handwriting expert testified that there were similarities between the handwriting on the note and Williams' handwriting, but he could not reach an opinion on whether Williams wrote the note.

At the Gilbert/Trias home, police found a drinking glass on the kitchen counter. Epithelial cells from a mucosal membrane, such as that on the inside of a person's mouth, were found on the glass. The cells were submitted to Cellmark Diagnostics, Inc. of Germantown, Maryland, for deoxyribonucleic acid (DNA) testing. At trial, a senior molecular biologist for Cellmark testified that test results obtained using a method called "polymerase chain reaction" showed that the types of DNA obtained from the epithelial cells on the glass were the same types as those found in the blood sample obtained from Williams. The biologist also testified that Gilbert and Trias were excluded by the tests as sources of the DNA.

Hairs discovered in the Gilbert/Trias home were found to be consistent with hair samples taken from Williams, but the State's expert testified that the hair comparison could not provide a positive identification. Additionally, a shoe print discovered in the kitchen was consistent with a photocopy of the soles of shoes stipulated to have been worn by Williams several months earlier.[1]

At trial, a critical State's witness was Carl Spoone, who became acquainted with Williams when the two were incarcerated together at the Anne Arundel County Detention Center following Williams's arrest. Spoone testified that Williams made statements at the jail incriminating himself in the murders of Gilbert and Trias. Spoone testified that he and another inmate were discussing God, when Williams became defensive and told them " 'how were them two ... them two [l]awyers prepared for God when I took the gun ... to the back of their head and blew their brains out?' " Spoone

---

**1.** The photocopy of the soles of the shoes previously worn by Williams apparently was obtained by police as part of an unrelated investigation several months before the murders.

further stated that later on in the conversation, Williams said that "the only thing that he had done it for was the red Legend...." According to Spoone, Williams also said that "the only thing that they could get on him was stealing the car and using the ATM card."

■ Additional facts relevant to the disposition of this appeal will be provided as necessary throughout this opinion.

## II. SUFFICIENCY OF EVIDENCE TO SUSTAIN BURGLARY CONVICTION

First, we consider Williams's contention that the evidence presented at trial was insufficient to sustain his conviction for burglary. The test for evidentiary sufficiency in a criminal case is " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359, 1366 (1991) (citations omitted), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

■ The essential elements of burglary are the breaking and entering of the dwelling of another at night with the intent to commit a felony. *E.g. Oken v. State,* 327 Md. 628, 662, 612 A.2d 258, 274 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993). The breaking element of burglary may be satisfied by evidence showing either an actual breaking, or a breaking accomplished constructively via artifice, fraud, conspiracy or threats. *Id.* Williams argues that there was no evidence of a breaking, either actual or constructive. Hence, Williams asserts that the trial court erred in not granting his motion for judgment of acquittal on the burglary charge. We agree.

■ In *Oken,* this Court reversed a burglary conviction because we found insufficient evidence of a breaking. 327 Md. at 663, 612 A.2d at 275. In that case, we noted that the only evidence of an actual or constructive breaking was testimony from several witnesses who stated that on prior occasions the

defendant had attempted to gain entry to homes by fraudulently representing that he needed to use the telephone, and on one occasion he attempted to stop a woman in her car by posing as a police officer. Based on this evidence, the State argued that the jury could have reasonably inferred that the defendant used a similar tactic to gain entry to the victim's home, where he committed murder. We reversed Oken's burglary conviction, explaining:

> "While it is true that ... a conviction may rest on circumstantial evidence alone, we have also explained:
>
>> 'to ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, ... a conviction [based] upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence.'
>
> Here, aside from the evidence of ruses employed by Oken in connection with the entry or attempted entry of other residences in the neighborhood of the victim's apartment, the record is completely devoid of any evidence showing a breaking, either actual or constructive, of [the victim's] apartment. Consequently, we are not convinced that a jury could find such circumstantial evidence inconsistent with any reasonable hypothesis that the victim's apartment was entered by Oken without a constructive breaking. Therefore, we hold that Oken's conviction for burglary must be reversed." (Citations omitted).

*Oken,* 327 Md. at 662–63, 612 A.2d at 275.

In the instant case, the State concedes that there was no evidence of a forced entry into the Gilbert/Trias home. As evidence of a breaking, the State points to testimony indicating that Trias was security conscious and that the home was equipped with a security system. The State contends that the "jury could infer that this type of person would not leave his door open for a stranger to walk in off the street," and that entry into the home "was made by Williams's opening a door, threatening the victims, or obtaining entry by deceit." We hold that any such inference, without more, is insufficient to prove a breaking beyond a reasonable doubt. We agree with

Williams that the evidence adduced at his trial to prove a breaking was even weaker than the evidence we found to be insufficient in *Oken*. Hence, we reverse Williams's burglary conviction. Because our reversal is based on a finding of insufficient evidence, Williams cannot be retried for burglary. *See Oken*, 327 Md. at 663, 612 A.2d at 275.

## III. ADMISSION OF "BURGLARS' TOOLS" INTO EVIDENCE

Next, we consider Williams's contention that the trial judge erred by admitting into evidence, over objection, several items taken from a bag that was in Williams's possession at the time of his arrest and from a briefcase seized from his residence. The items, some of which were characterized as "burglars' tools" by the State during closing arguments, included handcuffs, a pry bar, and a can of mace. Williams contends that these items lacked probative value because there was no evidence linking the tools to the murders or the other crimes with which he was charged. Further, he asserts that the admission of the pry bar, handcuffs, and mace was highly prejudicial because the items gave the jury a basis from which to infer that Williams had a propensity to commit crimes, and that he may have used the items to commit unrelated crimes.

In order for evidence to be admissible in a criminal case, that evidence must be relevant.[2] *State v. Joynes*, 314 Md. 113, 119, 549 A.2d 380, 383 (1988); *Dorsey v. State*, 276 Md. 638, 643, 350 A.2d 665, 669 (1976). Evidence is relevant when it tends to establish or disprove a fact at issue in the case. *Joynes*, 314 Md. at 119, 549 A.2d at 383. As we explained in *Joynes:*

"There are two important components to relevant evidence: materiality and probative value. Materiality looks

---

2. The general principles governing relevancy and the admissibility of evidence are now contained in Maryland Rules 5–401, 5–402, 5–403. The offenses for which Williams was charged occurred prior to July 1, 1994, the day the Maryland Rules of Evidence took effect. Although the rules do not apply in this case, we note that our holding would be the same under the rules in any event.

to the relation between the propositions for which the evidence is offered and the issues in the case. The second aspect of relevance is probative value, which is the tendency of evidence to establish the proposition that it is offered to prove. * * * Evidence which is thus not probative of the proposition at which it is directed is deemed 'irrelevant.' The trial judge is usually in the best position to evaluate the probative value of the proffered evidence. Where evidence is utterly lacking in probative value, it may be condemned as 'remote' or 'speculative.' " (Citations omitted).

314 Md. at 119–20, 549 A.2d at 383. A trial judge's determination on relevance will not be reversed absent an abuse of discretion. *White v. State,* 324 Md. 626, 637, 598 A.2d 187, 192 (1991).

A finding by the trial judge that a particular piece of evidence is relevant, however, does not mean that evidence is automatically admissible. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Hunt v. State,* 321 Md. 387, 425, 583 A.2d 218, 236 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); 5 LYNN McLAIN, MARYLAND EVIDENCE § 403.1, at 297 (1987). As with the trial court's relevancy determination, a decision to admit relevant evidence over an objection that the evidence is unfairly prejudicial will not be reversed absent an abuse of discretion. *Hunt,* 321 Md. at 425, 583 A.2d at 236.

Applying these principles to the instant case, we conclude that the judge abused his discretion in admitting the crow bar and can of mace found in Williams's possession at the time of his arrest. The State contends that the crow bar and mace were offered to prove "that Williams had the ability to burglarize the victims' home and subdue its occupants." According to the State, the crow bar and mace were relevant to connect Williams to the burglary of the Gilbert/Trias home because the "items were found in his possession soon after the crime was committed," and "the jury could infer that Williams was attempting to flee, with evidence of the crimes, after

seeing" news broadcasts indicating he was a suspect. We find these connections to the charged crimes to be highly remote and speculative.

There is simply no evidence in the record establishing any connection between the crow bar and mace and the crimes with which Williams was charged. As we discussed, in section II, *supra*, there was insufficient evidence adduced at trial to support a finding that Williams broke into the house. There was no indication that the crow bar was used to gain entry into the house, and the State conceded in its brief and during oral argument that there were no signs of forced entry into the home. There is no indication that Williams even had the crow bar and/or mace in his possession at the time he allegedly committed the murders and other crimes. Contrary to the State's contention that the items were seized "soon after" the crimes, the crow bar and mace were not taken from Williams until the day of his arrest, approximately four days after the murder and robbery of Gilbert and Trias. Since there is no evidence establishing a connection between the crow bar and mace and the crimes, the probative value of the items was virtually nil.

Furthermore, the danger of unfair prejudice in admitting the crow bar and mace substantially outweighed any minimal probative value. The admission of the items gave the jury a basis from which to conclude that Williams had a propensity to commit crimes, especially burglary. This danger was acute given the State's Attorney's reference to the items as "burglars' tools" during closing arguments. This Court has made clear that evidence tending to link a defendant to uncharged, unrelated criminal conduct is generally inadmissible.[3] *See, e.g,* *Ross v. State*, 276 Md. 664, 669, 350 A.2d 680, 684 (1976). The purpose of this rule is to prevent the jury from convicting a defendant on the basis that the defendant is a person of general criminal character, rather than a finding that the

---

**3.** There are several important exceptions to this rule, *see Ross v. State*, 276 Md. 664, 669–70, 350 A.2d 680, 684 (1976), but none are applicable in the instant case. *See also* Md. Rule 5–404(b).

defendant committed the specific crimes charged. *See id.;* 5 MARYLAND EVIDENCE § 404.5, at 352. *See also Ayers v. State,* 335 Md. 602, 631 n. 8, 645 A.2d 22, 36 n. 8 (1994)(other crimes evidence is excluded because "it is generally too prejudicial"), *cert. denied,* —— U.S. ——, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995).

Since there was no evidence linking the crow bar or mace to the crimes with which Williams was charged, there is a strong probability that the jury may have inferred from the evidence that Williams was a person of general criminal character. The danger of this kind of unfair prejudice substantially outweighed any minimal probative value of the crow bar and the mace. *See State v. Acklin,* 171 Conn. 105, 368 A.2d 212, 216–17 (1976)(holding that admission of masks and ropes seized from defendants at time of arrest was error because there was no evidence linking the articles to the robbery with which the defendants were charged). We hold that the trial judge erred in admitting the crow bar and mace.

Williams also objects to the admission of the two pair of handcuffs seized from a briefcase found during a search of his room. Williams contends that "only speculation" connected the handcuffs to the murders. We disagree. The evidence established that the bodies of Gilbert and Trias were found face down on their bed with their hands behind their backs in an unnatural position. Hence, it would be logical for the jury to infer that the victims' hands were bound behind their backs before they were shot. Further, there was no evidence of ligature marks on the victims' hands or wrists which might have indicated that rope was used. Thus, it might also be reasonable to infer that handcuffs were used in the murders. Therefore, the probative value of the handcuffs outweighed any prejudicial effect. We agree with the State that the trial judge did not abuse his discretion in admitting the handcuffs.

## IV. IMPEACHMENT OF DEFENSE WITNESS WITH JUVENILE DELINQUENCY ADJUDICATIONS

The next issue raised by Williams concerns the ruling of the trial judge allowing the State to impeach a key defense

witness using several of the witness's juvenile delinquency adjudications. The defense witness was another fellow inmate of Williams who testified that a vital State's witness, inmate Carl Spoone, was lying when he testified that Williams had confessed to the murders during a jailhouse conversation about God. The second inmate, Mark Wheelton, stated that he remembered being present during the conversation, and that Williams had not joined in the discussion. Wheelton further testified that he knew Williams for approximately three months while the two were incarcerated together, and that Williams never discussed the charges against him.

Before Wheelton took the stand, defense counsel asked the court to rule on the question of whether the State would be allowed to impeach Wheelton with his recent murder conviction and with several juvenile delinquency adjudications. After discussion with lawyers for both sides, the court ruled that the State could not use Wheelton's murder conviction as impeachment evidence because the deadline for Wheelton to file an appeal from the conviction had not expired.[4] As to Wheelton's juvenile delinquency adjudications, the court ruled that under the holding of *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the State could use the juvenile records to impeach Wheelton. As a result, the following cross-examination occurred:

"[STATE'S ATTORNEY]: [P]rior to ... being in the detention center you had in 1991 been found delinquent on three counts of breaking and entry, hadn't you?

[WHEELTON]: Yes.

[DEFENSE COUNSEL]: Your Honor, may I have a continuing objection?

---

4. The court did allow the State to impeach Wheelton with the fact that he had confessed to the murder, apparently on the theory that the killing was a prior bad act within the meaning of Md. Rule 5–608(b). Williams did not object to the impeachment of Wheelton with his confession to murder. Hence, we need not decide whether Wheelton's statement was a prior bad act that is "probative of a character trait of untruthfulness." *See* Maryland Rule 5–608(b). We in no way express approval, however, for the ruling of the trial judge.

THE COURT: You have a continuing objection.

[DEFENSE COUNSEL]: Thank you, Your Honor.

[STATE'S ATTORNEY]: And also in 1991 you were found to have been delinquent in regard to larceny and breaking and entry?

[WHEELTON]: Yes.

[STATE'S ATTORNEY]: And in 1992 you were found delinquent regarding breaking and entry and theft?

[WHEELTON]: Yes.

[STATE'S ATTORNEY]: And again, in 1992 you were found, uh, delinquent regarding daytime housebreaking?

[WHEELTON]: Yes."

Williams contends that the trial judge erred in allowing the State to impeach Wheelton with the juvenile adjudications. We agree. A juvenile delinquency adjudication is not a criminal conviction. Md.Code (1974, 1995 Repl. Vol.), Courts & Judicial Proceedings Art., § 3–824(a)(1). Hence, the rule is clear in Maryland that it is impermissible for the State to attack the credibility of a defense witness by directly asking him about his past record of juvenile offenses.[5] *See Westfall v. State,* 243 Md. 413, 423, 221 A.2d 646, 652 (1966). In *Lancaster v. State,* 86 Md.App. 74, 585 A.2d 274 (1991), *aff'd on other grounds,* 332 Md. 385, 631 A.2d 453 (1993), the Court of Special Appeals stated:

"The law is perfectly clear that it is 'impermissible to attack the credibility of a witness by asking him about his past record of juvenile offenses, directly, or indirectly.' Indeed, any inquiry, 'whether by record or by cross-exami-

5. We point out that our holding would be the same under Maryland Rule 5–609, which does not provide for impeachment of witnesses using juvenile adjudications. *See* LYNN McLAIN, MARYLAND RULES OF EVIDENCE § 2.609.3(5), at 155 (1994)("The federal rule provides for the admissibility of juvenile adjudications ... in certain circumstances. The Maryland Rule does not."). *See also* Committee Note to Md. Rule 5–609 (noting that evidence of juvenile adjudications is restricted, but that a defendant may have a right to impeach a State's witness under the Confrontation Clause pursuant to *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

nation, of determinations of prior juvenile delinquency is impermissible in any *adjudicatory* hearing.' " (Citations omitted).

86 Md.App. at 86, 585 A.2d at 280. This rule is designed to protect the confidentiality of juvenile proceedings. *See* Md. Code (1974, 1995 Repl.Vol.), Courts & Judicial Proceedings Art., §§ 3–824(b) and (c). *See also* 1 McCORMICK ON EVIDENCE § 42, at 147 (John W. Strong ed., 4th ed. 1992)("In statutes relating to proceedings in juvenile courts it is frequently provided that an adjudication of delinquency shall not be used in evidence against the child in any other court and shall not be deemed a 'conviction.' These statutes are usually construed as precluding the finding from being used as a conviction to impeach credibility.").

The trial judge's reliance upon *Davis, supra,* was plainly misplaced. *Davis* involved a *defendant's* constitutional right under the Sixth Amendment to confront a *State's witness* with his prior juvenile record to show bias on the part of the witness. *Davis,* 415 U.S. at 318–19, 94 S.Ct. at 1111–12, 39 L.Ed.2d at 355. *Davis* is not authority for allowing *the State* to violate the confidentiality of juvenile records through its cross-examination of a *defense* witness. *Davis* was based on a defendant's right to effective cross-examination under the Confrontation Clause of the Sixth Amendment to the federal Constitution. The State has no constitutional rights under the Sixth Amendment. Hence, *Davis* is inapposite.

Furthermore, even if we were to interpret *Davis* as applying to both State and defense witnesses, it would still be inapplicable in the instant case. *Davis* involved particular narrow factual circumstances in which the defendant was attempting to demonstrate that a State's witness's status as a juvenile offender on probation may have *biased* his testimony against the defendant. Under such circumstances, the Supreme Court found that the State's interest in protecting the anonymity of juvenile offenders was outweighed by a defendant's right to effective cross-examination *directed at possible bias* of the witness related to the witness's status as a juvenile delinquent. *Davis,* 415 U.S. at 319–20, 94 S.Ct. at 1111–12, 39

L.Ed.2d at 355–56. *Davis* does not stand for the proposition that a witness's *general credibility* may be impeached with juvenile adjudications. *See Davis*, 415 U.S. at 321, 94 S.Ct. at 1112–13, 39 L.Ed.2d at 356 (Stewart, J., concurring).

In the instant case, there was no allegation that Wheelton may have been biased in favor of Williams and against the State, or any indication that Wheelton's juvenile delinquency adjudications may have somehow motivated his testimony. In fact, the record makes clear that the trial judge's ruling was based on his belief that the juvenile adjudications were relevant to Wheelton's *credibility*, not bias:

"[DEFENSE COUNSEL]: Your Honor, may I—may I just say that—that this is really not an issue of bias, it's an issue of credibility. * * *

THE COURT: Well, isn't bias credibility?

[DEFENSE COUNSEL]: No, I think they're very different. * * * Credibility is, one, the ability to tell the truth. Bias is having an interest in the outcome.

They can certainly question him on whether or not he had an interest in the outcome. . . .

THE COURT: Well, but the problem is—the problem comes down, here's a man that has been convicted of—of things that would tend to show he's not—he wouldn't tell the truth. It seems to me that's absolutely pertinent.

[DEFENSE COUNSEL]: Again, I would call the court's attention that these are not convictions.

THE COURT: Oh, I understand it clearly says that, it clearly says that. * * * But I do think it tends to show his credibility. And I'm—I'm inclined to allow him to ask about that."

The cross-examination of Wheelton was not directed at possible bias, but rather his general credibility. Hence, *Davis* is inapposite. *See* Committee Note to Md. Rule 5–609 (noting that evidence of juvenile adjudications is restricted, but that they may be used by a defendant to show *bias* pursuant to *Davis* ). We agree with Williams that the trial judge erred in allowing the State to impeach Wheelton's general credibility with the juvenile delinquency adjudications.

## V. OBJECTIONS RELATED TO DNA EVIDENCE

### A. Restriction of cross-examination
### of State's expert witness

We next consider Williams's contention that the trial judge improperly restricted his cross-examination of an expert witness who testified for the State regarding the DNA testing that linked Williams to the crime scene. The DNA evidence, produced by Cellmark Diagnostics, Inc. of Germantown, Maryland, consisted of test results comparing the DNA from a sample of Williams's blood to that in epithelial cells found on a drinking glass in the kitchen of the Gilbert/Trias home. Melissa Weber, the senior molecular biologist at Cellmark who performed the tests, testified that the test results showed that the types of DNA obtained from the glass were the same types as those found in the blood sample obtained from Williams. Weber also testified that Gilbert and Trias were excluded by the tests as sources of the DNA.

Weber testified that the DNA evidence was obtained using a DNA testing procedure called "polymerase chain reaction" (PCR). PCR testing differs from a more established form of DNA testing, known as "restriction fragment length polymorphism" (RFLP). Weber stated that while RFLP testing can provide a "very specific match between two samples," PCR testing can only "narrow down a potential number of donors to a certain group." She explained that while RFLP testing requires a large sample of material, PCR testing can be done on much smaller samples because it isolates and then replicates the DNA before typing it.[6]

---

**6.** The "polymerase chain reaction" (PCR) process, like the "restriction fragment length polymorphism" (RFLP) process, is designed to identify which forms of a particular gene are contained in a given sample. As we explained in *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996):

"For each genetic characteristic, there may be two or more variations or forms of the controlling gene, which are called alleles. Each parent contributes one copy of each gene, so every individual has two copies or alleles of each gene. For two-allele genes, *i.e.*, genes with only a 'form A' and a 'form B,' an individual may end up with one of three possible combinations: AA, AB, or BB. Each combination of alleles is known as a genotype." (Citations omitted).

Note 6—Continued

342 Md. at 67, 673 A.2d at 235. For forensic identification, PCR is used to identify the alleles contained in a crime scene sample and to compare this information with a sample taken from the suspect.

PCR involves three basic steps. *See* COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE, at 40–44 (1992)(NRC REPORT). First, the DNA must be extracted from the crime scene sample and purified. In some instances, suspect and victim DNA are identified and separated; however, separation is only possible with sperm samples, and can not be used in the case of saliva or blood. NRC REPORT, at 65–66. Next, the DNA sample is heated so that the two intertwined strands that make up the DNA helix are "unraveled," and separated. NRC REPORT, at 40. Chemical substances known as "primers" are then attached to the DNA strands to "block off" the segments of the strand that contain the specific alleles to be identified. NRC REPORT, at 40–41 (Fig.1–6).

The second step in the process is amplification. Using a process similar to the cell's own mechanism for producing DNA, the small DNA sample retrieved from the crime scene is copied a number of times to generate a larger sample for further testing.

Finally, the third step in the process is identification. This may be accomplished in several ways, but the most common method is known as "reverse dot blotting." NRC REPORT, at 42. In this procedure, the amplified DNA sample is washed over a membrane or a test strip embedded with chemical probes designed to bond with particular alleles. If the sample of DNA taken from the crime scene includes an allele that matches the probe embedded at a particular location on the test strip, a colored dot will appear at that location on the strip. When the DNA sample is washed over a test strip embedded with probes for every possible allele of a given gene, a pattern of blue dots will appear.

Because each person possesses two alleles for each gene, only one or two dots, indicating a match, should appear on the strip. If only one dot appears, that indicates that the sample contains two copies of the same allele (*i.e.,* "AA" or "BB"). Samples with two copies of the same allele are termed "homozygous." If two dots appear, then the sample likely contains two different alleles (*i.e.,* "AB"), although this result may also indicate contamination of a homozygous sample. NRC REPORT, at 68. Samples with two different alleles are termed "heterozygous." Furthermore, if more than two dots appear, this may indicate a contamination problem. *Id.*

To illustrate this process, one commercial PCR test kit identifies the alleles of the HLA gene (the HLA–DQ alpha test). *See* Henry C. Lee et al., *DNA Typing in Forensic Science*, 15 AM. J. MED. & PATHOLOGY 269, 277–78 (1994). There are six alleles or forms of this gene, which are denoted 1.1, 1.2, 1.3, 2, 3, and 4. There are twenty-one possible combinations of these six alleles. Because some alleles are more common than others, the likelihood of possessing a particular combination of alleles is not simply 1/21. Instead, the likelihood of possessing a particular combination of alleles of the HLA gene is determined by evaluating the frequency of occurrence of that combination in the population. *See* 15 AM. J. MED. & PATHOLOGY, at 278.

Before trial, Williams moved to exclude the PCR test results. A two-day hearing was held during which the court heard expert testimony concerning PCR testing and whether it had attained general acceptance in the scientific community. *See Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 368 (1978). After the hearing, the trial judge denied Williams's motion to exclude the DNA evidence, concluding "there is a general acceptance in the relevant scientific community as to the reliability of PCR...." Before addressing Williams's challenge to the admissibility of the PCR evidence, *see* Section V(B), *infra,* we shall consider his contention that the trial judge improperly restricted his attempts to cross-examine Weber concerning the frequency of errors and contamination occurring during PCR testing at Cellmark.

On direct-examination, Weber was asked by the State to describe the procedures for PCR testing, and the steps taken to ensure that technicians at Cellmark properly perform the tests. Weber explained that Cellmark technicians undergo blind "proficiency tests" given by independent forensic associations to determine if the lab's procedures are working properly. Weber testified that Cellmark had no errors in any of the PCR proficiency tests the laboratory performed.

During cross-examination, defense counsel asked Weber about testing errors and incidents of contamination that occurred apart from the proficiency tests. Specifically, defense counsel queried whether any tests at Cellmark ever had been contaminated from testing solution accidentally spilling over onto a sample and polluting it. Weber acknowledged that she could think of at least one occasion where such spill-over

---

In addition to the HLA–DQ alpha test, there are now a number of other recently introduced commercial kits. *Id.* Some of these new kits test more than one gene. For example, the Polymarker kit tests five additional genes. *Id.* Using both the HLA–DQ alpha test and the Polymarker test substantially increases the discriminating power of PCR testing for forensic identification. *Id.* Both the HLA–DQ alpha and the Polymarker tests were used in this case.

contamination of a sample had occurred while she was performing a test. Defense counsel then sought to ask Weber how often such errors occurred at Cellmark generally, and the State objected on the ground that the question was irrelevant. At a bench conference, the following colloquy ensued:

"COURT: Okay. What's your proffer?

[DEFENSE COUNSEL]: Your Honor, it's the same issue that I dealt with earlier. I think that in order to make an assessment about the effect of contamination in the laboratory, I am entitled to find out how often it happened, if it happened very often with this technician, if it was discussed in the lab, if the lab took steps to deal appropriately with it.

\* \* \* \* \* \*

[STATE'S ATTORNEY]: It does not matter if fifty percent of their cases were contaminated. What matters is this one.

\* \* \* \* \* \*

COURT: Okay. I thought you were going to ask her, because you had some contamination in one instance, does it carry over to all the rest of them. That's what I thought you were going to ask her. Now, you're going back and rehashing the whole thing over again. I mean, I don't mind you asking her . . . if the fact that she had a contamination before, does it carry over to everything they do.

[DEFENSE COUNSEL]: [We] also want[ ] to ask her about incidents of contamination in the lab by other technicians. She was allowed to testify about proficiency tests by other technicians. \* \* \* So she ought to be able to be allowed . . . to testify to other incidents of contamination.

\* \* \* \* \* \*

[STATE'S ATTORNEY]: Your honor, what is the relevance of other cases?

COURT: Yeah, I—

[STATE'S ATTORNEY]: It's just not relevant.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Your Honor, there's a more general issue here. When a witness says, I've never made

an error, certainly I can ... I don't think I'm confined to simply saying well, what proficiency tests have you done. Obviously, I have to—I have to be able to cross-examine on the basis—

COURT: Well, what do you want to ask her about the proficiency test?

[DEFENSE COUNSEL]: About how many times these errors have occurred.

COURT: To her.

[DEFENSE COUNSEL]: About how many times contaminations occurred, yes.

COURT: To her.

[STATE'S ATTORNEY]: Only to her.

COURT: She's—that's what she answered. She's the one that answered.

[STATE'S ATTORNEY]: She can't speak for other technicians anyway.

COURT: Yeah.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Your Honor, with all due respect, she already has testified as to the proficiency testing of all the other technicians at Cellmark. So why shouldn't she be able to be asked about contaminations by other—

COURT: Well, maybe she doesn't know.

[DEFENSE COUNSEL]: Maybe she does though. Let us ask the question.

\* \* \* \* \* \*

[STATE'S ATTORNEY]: Nobody else touched this case, so what difference does it make?"

At that point, the trial judge asked Weber whether she knew when other technicians in the lab made mistakes, and Weber responded that she did not. Because the question occurred at the bench conference, the jury did not hear the question or Weber's response. After Weber answered the question, the

judge ended the line of inquiry, and defense counsel objected to not being allowed to further pursue the line of questioning.

Our review of the trial transcript convinces us that the trial judge erred in restricting defense counsel from cross-examining Weber concerning the frequency of contamination during PCR testing at Cellmark. Williams should have been allowed to pursue fully questions regarding testing errors and possible spill-over contamination in the lab.

■■■■ As a general rule, great latitude should be allowed in the cross-examination of expert witnesses. 3 CHARLES E. TORCIA, WHARTON'S CRIMINAL EVIDENCE § 601, at 160 (13th ed.1973). *See also* 2 SPENCER A. GARD, JONES ON EVIDENCE § 14:30, at 665–67 (6th ed.1972). Thus, as a general matter, when DNA evidence is admitted against an accused in a criminal trial, questions on cross-examination regarding how that specific DNA evidence was obtained, and the laboratory conditions under which the DNA tests in that case were conducted, should be allowed. *See United States v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993)(noting that " 'vigorous cross-examination of the government's experts' " assists the jury in determining how much weight to give DNA evidence) (citation omitted); *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502, 512 (1993)(noting that thorough cross-examination of State's experts on the possibility of error in the laboratory and errors in the proficiency test allowed the jury to get "a balanced picture" of the DNA evidence).

■■■ Furthermore, cross-examination about incidents of spill-over errors and other contamination was especially pertinent in the instant case given that the test results were obtained using PCR testing. Possible contamination of samples is a major concern with the reliability of forensic use of PCR testing:

"[T]he extraordinary sensitivity of PCR is known to make it susceptible to contamination and may, therefore, be its Achilles heel. Contamination of the PCR reaction in a forensic laboratory with even the smallest trace amounts of DNA from another individual could produce a misidentifica-

tion. Although this is likely to be rare, there is no way to demonstrate whether cross-contamination has or has not occurred. Cross-contamination occasionally occurs in molecular biology laboratories, and has been a concern with respect to the use of PCR in medical research. Hence, PCR requires extraordinarily tight quality control assurances." (Footnotes omitted).

William C. Thompson and Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 VA. LAW REV. 45, 77–78 (1989). *See also* Note, Janet C. Hoeffel, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant,* 42 STAN. L. REV. 465, 482 (1990)("The PCR technique . . . is particularly susceptible to contamination. . . ."). A 1992 report on DNA testing produced by a committee of leading forensic scientists stressed the importance of preventing contamination problems in laboratories where PCR testing is performed:

"One of the most serious concerns regarding PCR-based typing is contamination of evidence samples with other human DNA. PCR is not discriminating as to the source of the DNA it amplifies, and it can be exceedingly sensitive. Potentially, amplification of contaminant DNA could lead to spurious typing results."

COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE, at 65 (1992).[7]

---

7. The NRC REPORT suggested three possible types of contamination that could affect PCR results:

1. mixed samples (i.e., of suspect and victim DNA, or of multiple suspects);
2. contamination from handling in the field and in the laboratory; and
3. "carryover contamination" from one PCR test to another.

NRC REPORT, at 65–66.

Although laboratories have implemented a variety of experimental controls to identify potential contamination in the PCR laboratory, these controls may not identify pre-existing contamination that occurs at the crime scene or in handling prior to arrival at the testing laboratory. As the NRC REPORT indicates, "[e]ven the simple act of

In the instant case, Williams sought through the proffered line of questioning to cast doubts on the reliability of the testing procedures used by Cellmark. This was a legitimate method of responding to the DNA evidence, especially considering the well-recognized effects of contamination on PCR test results. Cross-examination of Weber regarding the frequency of spill-over errors and contamination in the laboratory could have been vital to the jury's determination of how much weight to give to the PCR test results. *See Armstead v. State*, 342 Md. 38, 66, 673 A.2d 221, 235 (1996)(noting that "case-specific challenges to the manner in which a particular [DNA] test was conducted" ordinarily go to the weight of the evidence). Therefore, we hold that the trial judge erred in restricting Williams from fully cross-examining Weber con-

---

flipping the top of a plastic tube might aerosolize enough DNA to pose a problem." NRC REPORT, at 66.

Furthermore, even if there is no indication of contamination of the suspect's PCR test, it is important to consider both systemic contamination problems in the laboratory, as well as isolated, unrelated instances of contamination that occurred close in time to testing of the suspect's DNA, because:

"it should be remembered that the controls are useful for monitoring general contamination in the laboratory, not the accuracy of a particular experiment. *If a blank control is positive in one experiment, it indicates a potential problem not just for that experiment, but for any experiment performed at about the same time*—even in a laboratory contaminated with PCR carryover, blank controls do not necessarily become contaminated on every occasion." (Emphasis added).

NRC REPORT, at 67.

While we concluded in *Armstead* that "the better approach is generally to treat individualized errors in application of the DNA technique as matters of weight" rather than admissibility, we observed that some errors, including contamination or degradation of the DNA sample, might warrant exclusion. 342 Md. at 64 & n. 18, 673 A.2d at 234 & n. 18. Evidence of contamination of the suspect's test or of a systemic contamination problem in the laboratory may justify exclusion of the PCR results. Therefore, the trial judge should permit full exploration of any potential contamination to determine whether the DNA evidence is admissible.

In addition, we reject the State's contention that "[i]t does not matter if fifty percent of their cases were contaminated. What matters is this one." Although a scientific test need not be infallible to satisfy the due process requirement of "fundamental fairness," due process precludes the use of scientific test results that are grossly inaccurate. *Armstead*, 342 Md. at 84–85, 673 A.2d at 244.

cerning the prevalence of testing errors and contamination during PCR testing at Cellmark.

### B. Objection to admissibility of DNA evidence obtained via the PCR testing method

Williams also contends that the PCR test results themselves should not have been admitted at trial. In *Armstead*, our most recent case dealing with the admissibility of DNA evidence, we delineated the general principles governing the admissibility of scientific evidence in Maryland courts:

> "[N]ovel scientific evidence may become admissible in one of several ways. First, the evidence may be admitted by statute, if a relevant statute exists. *See* 5 McLAIN, MARYLAND EVIDENCE § 401.4(c), at 277–78 (1987). Second, the proponent can prove that the evidence meets the *Reed* standard of "general acceptance" in the relevant scientific community. *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 368 (1978)(quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923))."

342 Md. at 54, 673 A.2d at 228–29. DNA evidence obtained using RFLP testing is admissible in Maryland pursuant to statute. *See* Md.Code (1974, 1995 Repl.Vol.), Courts & Judicial Proceedings Art., § 10–915. The statute does not apply to DNA evidence obtained using PCR testing, and this Court has not passed on the question of whether the PCR method meets the *Frye–Reed* test.

Because we reverse Williams's convictions on other grounds, we need not decide whether the PCR method of DNA testing is admissible under the *Frye–Reed* standard. Further, given the rapidly developing scientific data on the reliability of the PCR method of DNA testing, we believe it might be premature to pass on the question based on the record from the initial *Frye–Reed* hearing in the instant case, which is more than a year old. Therefore, should the State seek to admit the PCR evidence at Williams's second trial, the trial court should consider conducting a new *Frye–Reed* hearing on the question of whether PCR testing results are admissible.

## VI. HARMLESS ERROR

The State contends that even if errors were made during Williams's trial, reversal is not required because the errors were harmless. The State argues that the impact of the errors we have outlined was "insignificant" in the face of the "overwhelming evidence against Williams." The State points to the various circumstantial and forensic evidence linking Williams to the crime scene, including the hair comparison, the shoeprint evidence and the similarity of his handwriting to that on the "on vacation" sign, and to the evidence showing that Williams used the victims' ATM bank cards in the days after the murders.

In *Dorsey, supra,* this Court laid down the standard for determining whether an error in a criminal case can be deemed "harmless:"

"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and reversal is mandated."

276 Md. at 659, 350 A.2d at 678. In the instant case, we are unable to conclude that the several errors committed in the trial court were harmless beyond a reasonable doubt.

Initially, we point out that much of the evidence linking Williams to the crime was not conclusive. For example, although fibers from the brown cotton gloves found in Williams's bedroom were consistent with those found on the tape securing the "on vacation" sign at the murder scene, the State's expert witness could not rule out the possibility that the fibers on the tape could have come from another pair of cotton gloves. Further, the handwriting expert called by the State testified that he could not give an opinion on whether the "on vacation" sign was in Williams's handwriting. Hairs discovered in the home were found to be consistent with hair samples taken from Williams, but again the State's expert testified that the hair comparison was "not a basis for positive

personal identification." In addition, although some items of clothing seized from Williams's room and his person tested positive for blood, the source of the blood could not be determined. Finally, while the shoe print discovered in the kitchen was consistent with a photocopy of shoes worn by Williams months earlier, an expert witness acknowledged that he could not make a positive identification.

At the same time, several of the errors committed at trial were highly prejudicial. For example, the improper use of juvenile delinquency adjudications to impeach defense witness Mark Wheelton impacted the credibility of a critical defense witness. While substantial circumstantial evidence was produced at trial linking Williams to the crimes, the only *direct evidence* establishing Williams's guilt was Carl Spoone's testimony that Williams had confessed to the murders during a jailhouse conversation about God. Wheelton's testimony directly rebutted Spoone's version of events. Hence, Wheelton's credibility as a witness was vital to Williams's defense.

Additionally, as we have explained, the trial court's restriction of Williams's cross-examination of the State's DNA expert, Melissa Weber, was prejudicial. Refusing to allow Williams to question Weber about general problems of contamination of PCR samples at Cellmark deprived Williams of the full opportunity to cast doubt on the reliability of the DNA evidence. Further, as we discussed in Section III, *supra*, the trial judge erred in admitting into evidence a crow bar and mace seized from Williams at the time of his arrest. There was no evidence linking either item to the crimes with which Williams was charged, and the admission of the items was unduly prejudicial. The significance of this error was compounded by the trial judge's ruling denying Williams's motion for a judgment of acquittal on the burglary charge, because it would have been fair for the jury to infer that the burglar and murderer were the same person. As we explained in Section II, *supra*, the charge of burglary against Williams should never have been sent to the jury because there was no evidence of a breaking.

Given the cumulative effect of these errors, we cannot conclude beyond a reasonable doubt that the jury's verdict was not influenced. Thus, we must reverse Williams's convictions and remand this case for a new trial.

## VII. OTHER ALLEGATIONS OF ERROR

Because the State will undoubtedly seek to retry Williams for the murders of Gilbert and Trias, we will take this opportunity to provide guidance on several other issues raised on appeal that will very likely arise again in a second trial.

### A. Motion to suppress physical evidence

First, we will consider Williams's motion to suppress physical evidence on the ground that it was seized in violation of the Fourth Amendment's prohibition of unreasonable searches and seizures. Williams moved before trial to suppress several items seized during searches of his room and of the brown bag in his possession at the time of his arrest. Both the bag and the room were searched pursuant to a warrant.[8] Several items, including the crow bar, mace, handcuffs and Gilbert's gold watch, were seized. After a pre-trial suppression hearing, the trial judge denied Williams's motion to suppress the physical evidence.

### 1. Probable cause underlying the search warrant

First, Williams attacks the magistrate's determination that probable cause existed to issue the warrant. The Fourth Amendment of the United States Constitution and Article 26 of the Maryland Declaration of Rights require that no search warrant shall issue without probable cause. *State v. Lee,* 330 Md. 320, 326, 624 A.2d 492, 494–95 (1993). Probable cause means a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " *Lee,* 330 Md. at 326, 624 A.2d at 495 (citation omitted). Appellate review of

---

**8.** Police obtained a search warrant after arresting Williams that provided for a search of Williams's mother's house and "[o]ne brown bag. . . ."

a magistrate's probable cause determination is limited to whether the magistrate had " 'a "substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing. . . .' " *Potts v. State,* 300 Md. 567, 571, 479 A.2d 1335, 1337 (1984) (citation omitted).

Williams argues that the probable cause determination for the search warrants was invalid because the warrants authorized the police to seize clothing, including "boots and or shoes" and "hooded jackets, sweat shirts and coats," even though the clothing worn by the perpetrator of the crime was unknown at the time. We find no merit in this contention. The full description of the items to be seized under the warrants authorized the police to seize "[a]ny and all boots and or shoes, eyeglasses, bandannas, hooded jackets, sweat shirts and coats." There was a more than adequate basis in the affidavit for the magistrate to include these items in the warrant. The affidavit described photographs taken by bank security cameras at the time cash was withdrawn from ATM machines using the bank cards belonging to Gilbert and Trias. One photograph, which was attached to the affidavit as an exhibit, showed a man wearing a bandanna, glasses and some type of jacket or coat making the ATM withdrawal. We conclude that the magistrate had a substantial basis from which to find that the items of clothing listed could have linked Williams to the crimes.

### 2. Items from brown bag

Williams also contends that certain items seized from the brown bag should have been suppressed because they did not fit within the description in the warrant of items to be seized. The Fourth Amendment requires that search warrants particularly describe the place to be searched and the things to be seized. U.S. CONST. amend. IV. Williams argues that the several items seized from the brown bag were outside the scope of the warrant, and therefore should have been suppressed. Specifically, Williams points to the following items seized from the brown bag: (1) the crow bar; (2) a pair of shorts; (3) two store receipts; (4) cigarettes; and (5) a jar

of Vaseline. Although only the crow bar and the receipts were actually admitted as evidence at trial, we cannot anticipate whether the State will seek to admit other items seized from the bag at a second trial. Hence, we will briefly consider Williams's objections to all five items.[9]

Even assuming Williams is correct that none of the five items fits within the description of items to be seized in the warrant, several of the items were clearly within the scope of the plain view doctrine, and thus not subject to suppression. As we explained in *Livingston v. State*, 317 Md. 408, 564 A.2d 414 (1989):

"The plain view doctrine 'serves to supplement a previously justified intrusion, ... and permits a warrantless seizure.' *State v. Wilson*, 279 Md. 189, 194, 367 A.2d 1223, 1227 (1977). Therefore, when the police (1) have a prior justification for their intrusion; (2) inadvertently discover evidence which is in plain view; and (3) immediately perceive that what they have discovered is evidence, they are permitted to seize that evidence."

317 Md. at 412, 564 A.2d at 416–17. Here, there is no question that police were justified in searching the brown bag pursuant to a valid warrant, and that the items were discovered inadvertently during the search. The only question is whether the police had probable cause to believe the items were incriminating. *See Livingston*, 317 Md. at 412 n. 5, 564 A.2d at 417 n. 5.

▮▮▮ We believe the police had probable cause to seize the store receipts, which provided police with vital evidence of Williams's location and activity after the murders. The receipts also provided police with evidence that Williams had spent money, which was significant because police had evidence that Williams had withdrawn money using the victims' ATM cards. Further, one of the receipts had a Baltimore address, and police knew that Gilbert's Acura Legend had

9. Williams does not argue that other items seized from the bag, including the gold watch and mace, should have been suppressed.

been discovered in Baltimore. The fact that the officer who seized the receipts may have had to peruse them to some extent before ascertaining that they potentially linked Williams to the crimes does not take the seizure outside the scope of the plain view exception. The warrant authorized police to seize various documents and receipts from the bag, including "[a]ny and all documents, papers, [or] writings" belonging to Gilbert or Trias, or any documents tending to show a connection between Williams and Gilbert and Trias. Thus, the police were entitled to peruse the receipts to determine whether they were within the scope of the warrant. *See U.S. v. Menon*, 24 F.3d 550, 563 (3rd Cir.1994)(recognizing that when a search warrant authorizes the seizure of documents, police are entitled to glance at each document to determine whether it is within the scope of the warrant); *see also United States v. Slocum*, 708 F.2d 587, 604 (11th Cir. 1983). In the course of lawfully examining these receipts, the police obtained probable cause to seize them under the plain view exception.

 Police also had probable cause to seize the cigarettes, because officers had observed a cigarette butt at the crime scene. Police had probable cause to seize the crow bar, which they could have believed at that time may have been used to gain entry to the house.[10] There was no testimony at the suppression hearing as to the evidentiary significance of the jar of Vaseline or the shorts, both of which Williams now complains were improperly seized. Hence, we cannot conclude they were within the plain view exception.

## B. Motion to suppress statements to police

Williams also contends that the trial judge erred in denying his motion to suppress statements he made to police following

---

**10.** Although we held in Section III, *supra,* that the crow bar should not have been admissible at trial on relevancy grounds, we merely note here that the trial judge did not err in refusing to suppress it because of a Fourth Amendment violation.

his arrest. According to testimony from the suppression hearing, Williams was taken to the police station after his arrest and placed in an interview room, where he waited for approximately 15 minutes. When police Detectives Tim Zywiolek and Keith Williams entered the room and identified themselves, Williams asked why he was being detained. The officers informed Williams that he was under arrest for a double murder. One of the officers then showed Williams a photograph portraying Williams using one of the victims' ATM cards. According to Detective Zywiolek, Williams stated " '[y]eah, that's me' " upon seeing the photograph. Following that statement, Williams was given his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After receiving his *Miranda* warning, Williams indicated to police that he did not want to answer further questions and indicated he wanted an attorney. As the officers began to gather their papers, one of the officers told Williams to remove his earring and Williams mumbled under his breath, "you can't get me. I'll just say a girl gave me the card." After this second statement, Detective Zywiolek testified that he commented that "[t]his is going to work" and reiterated to Williams that he was being charged with the murders of Gilbert and Trias. At that point, Williams made a third statement: " 'I know I'm never getting out.' " Detective Zywiolek testified that Williams was not looking at police when he made the second and third statements, but rather seemed to be "in his own little world."

The trial judge suppressed the first statement by Williams "[y]eah that's me," because it was made before Williams had received his *Miranda* warning. The judge denied Williams's motion to suppress the second and third statements to the detectives. Williams contends that the second and third statements, made after the *Miranda* warning and after Williams

requested an attorney, also should have been suppressed.[11] We disagree.

It is established law that once a defendant, "detained in a custodial setting, has asserted his right to counsel, all interrogation must cease until an attorney has been furnished to consult with him or he initiates further communication, exchange or conversations." *State v. Conover,* 312 Md. 33, 38, 537 A.2d 1167, 1169 (1988)(citing, *inter alia, Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386–87 (1981)). Hence, the question before us is whether the police continued to interrogate Williams after he invoked his right to remain silent and requested an attorney. The Supreme Court has made clear that, after a suspect has requested an attorney, "interrogation" includes more than direct questioning:

> " '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnote omitted).

*Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980). *See also Conover,* 312 Md. at 38–39, 537 A.2d at 1169–70.

Thus, we must decide whether the words and actions of the detectives were reasonably likely to elicit incriminating responses from Williams. We conclude that they were not. The testimony from the suppression hearing reveals that Williams made the second statement, "you can't get me. I'll just say a girl gave me the card," as the police officers began to gather their papers and told Williams to remove his earring. These were routine procedures that the

---

11. The question of whether the trial judge was correct in suppressing Williams's first statement to police, made before the *Miranda* warning, is not before us on this appeal. Hence, we must assume, for purposes of our analysis of the subsequent statements, that the trial judge's ruling was correct.

officers could hardly be expected to anticipate would prompt an incriminating statement. Williams made the third statement, "I know I'm never getting out," after one of the officers commented that "[t]his is going to work" and reiterated to Williams that he was being charged with two murders. These comments simply advised Williams that police had evidence they believed established Williams's guilt in a double homicide, and as a result he was being charged with murder. We cannot conclude that the trial judge erred in finding that these innocuous comments were not reasonably likely to elicit an incriminating response from Williams. *See United States v. Payne*, 954 F.2d 199, 202 (4th Cir.)("[T]he *Innis* definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."), *cert. denied*, 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992); *Conover*, 312 Md. at 42–45, 537 A.2d at 1171–72 (finding no interrogation where police provided defendant with statement of charges explaining evidence against him). Thus, we find that Williams's statements were not the result of police interrogation.

We also reject Williams's contention that the "illegality" of the first, pre-*Miranda* statement "tainted" the second and third statements. Assuming the first statement was obtained in violation of *Miranda*, it was not coerced or involuntarily made. Since the second and third statements were made voluntarily after Williams received a *Miranda* warning, any "illegality" did not taint those subsequent statements. *See Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222, 237–38 (1985). We find no error in the trial judge's ruling that the second and third statements by Williams were not subject to suppression.

### C. Objection to victim impact statements

The final issue we shall consider is whether the trial judge erred in admitting certain victim impact statements at the sentencing hearing. At the hearing, the judge admitted, over objection, two "victim impact" statements written by a friend

of Gilbert and a colleague of Trias. Williams contends the admission of the written statements was improper. We agree.

The admissibility of victim impact statements in cases in which the State seeks the death penalty or imprisonment for life without parole is governed by Md.Code (1957, 1993 Repl.Vol.), Art. 41, § 4–609(d),[12] which provides:

> "In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413."

The plain language of the statute makes the preparation of a presentence investigation (PSI) report by the Division of Parole and Probation mandatory in a death penalty case, and requires that a victim impact statement be included in or incorporated as part of the PSI. The PSI in the instant case was completed before trial and apparently *did not* include any victim impact statement as required by the statute. As a result, the State's Attorney independently offered two written statements from friends of Gilbert and Trias, arguing that they were admissible as "victim impact" statements. The judge agreed and admitted the statements.

The State contends that the written statements were admissible under Art. 41, § 4–609(c)(2)(ii), which authorizes the State's Attorney to prepare and submit a victim impact statement for consideration in cases where the court does not order a PSI. We disagree with the State's contention. Section 4–609(c) is a general provision that applies prior to the circuit court sentencing a defendant to the jurisdiction of the Division of Correction. It provides the court with the *discretion* to order a PSI in felony and certain misdemeanor cases "if the court is satisfied that the investigation would help the sentenc-

---

12. Unless otherwise provided, all statutory references hereinafter are to Maryland Code (1957, 1993 Repl.Vol.), Article 41.

ing process." Art. 41, § 4–609(c)(1). Section 4–609(c) does not apply in death penalty cases, which are specifically governed by § 4–609(d), and in which a PSI and victim impact statement are *mandatory* rather than discretionary. *See Passnault v. Board of Admin. Appeals,* 309 Md. 466, 475, 525 A.2d 222, 226 (1987)(noting that an applicable specific statute controls over a general statute). *See also State v. Kennedy,* 320 Md. 749, 755, 580 A.2d 193, 196 (1990). Hence, the State has no right in a death penalty case to admit its own written victim impact statements under § 4–609(c)(2)(ii). The only written victim impact statement admissible in a death penalty case is that contained in the PSI prepared by the Division of Parole and Probation and specifically authorized as well as required by § 4–609(d). Because the statements written by friends of Gilbert and Trias were not included in or incorporated as part of a PSI prepared pursuant to § 4–609(d), they should not have been admitted.

We stress, however, that we do not mean to rule out the possibility that information from friends or colleagues of a victim might be considered in the sentencing phase of a death penalty case. Such information may well be admissible if it is included in or incorporated as part of the PSI report prepared by the Division of Parole and Probation, which has wide latitude in preparing such reports. Our interpretation of the statute is simply that the only written victim impact statements that are admissible in death penalty cases are those made part of a PSI prepared by the Division of Parole and Probation as authorized by Art. 41, § 4–609(d).[13]

The State also argues that despite the unambiguous language of the PSI statute, the statements from the friends of Gilbert and Trias were admissible at sentencing under the holding of *Reid v. State,* 302 Md. 811, 490 A.2d 1289 (1985). In *Reid,* we held that the State could admit, in addition to the

13. In the instant case, Williams's objection was to the admissibility of the "victim impact" statements offered by the State's Attorney, rather than to the absence of the PSI required by Art. 41, § 4–609(d). We note that the unobjected to failure to prepare the PSI and victim impact statement may not be grounds for reversal.

victim impact statement prepared by the Division of Parole and Probation and included in the PSI, a separate, additional victim impact statement prepared by the State's Attorney. 302 Md. at 821, 490 A.2d at 1294. We interpreted a prior version of the PSI statute, then codified as Md.Code (1957, 1982 Repl.Vol.), Art. 41, § 124, as setting "a minimum standard for what the sentencing judge ... must consider...." *Reid*, 302 Md. at 821, 490 A.2d at 1294. We stated that the statute "does not prevent additional statements or comments from being offered by the victim, his family or the State's Attorney," and we left it to the discretion of the sentencing judge whether to receive and consider such supplemental statements. *Id.*

This reasoning, however, does not apply in the instant case. *Reid* was not a death penalty case. As we have explained, the admissibility of victim impact statements in death penalty cases is specifically governed by Art. 41, § 4–609(d), which requires that the Division of Parole and Probation prepare a PSI and victim impact statement in every death penalty case. Our decision in *Reid* was based on a prior version of the PSI statute which did not include the provision mandating the preparation of a presentence investigation and victim impact statement by the Division of Parole and Probation in all capital cases. The legislature added that provision in 1983. *See* Chapter 297 of the Acts of 1983.

We believe that the specific provision requiring a PSI and victim impact statement, now codified as Md.Code (1957, 1993 Repl.Vol.), Art. 41, § 4–609(d), controls the admissibility of victim impact statements in death penalty cases. In adopting this specific provision requiring the preparation of a victim impact statement by the Division of Parole and Probation in all death penalty cases, we believe that the legislature intended to limit the use of written victim impact statements in death penalty cases to those included in or incorporated as part of a PSI prepared by the Division of Parole and Probation. *See Scott v. State*, 297 Md. 235, 246–52, 465 A.2d 1126, 1132–35 (1983)(recognizing that the type of evidence admissible pursuant to the sentencing statutory scheme in a death

penalty case is generally more restricted than evidence admissible at sentencing in a non-death penalty case).

■ The State also argues that the statements are admissible under a provision of the general statute governing the admissibility of evidence at a capital sentencing proceeding. Md.Code (1957, 1992 Repl.Vol., 1995 Supp.), Art. 27, § 413(c)(v) allows the court to admit "[a]ny other evidence that [it] deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." As with § 4–609(c), this general provision does not apply in the instant case, however, because the legislature has enacted a specific statute dealing with admissibility of written victim impact statements. *See Passnault,* 309 Md. at 475, 525 A.2d at 226. *See also Kennedy,* 320 Md. at 755, 580 A.2d at 196.

### VIII.

Williams also raises several other allegations of error, which, given our reversal, we need not address.

*JUDGMENTS REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR NEW TRIAL. COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.*

BELL, J., concurs in the judgment and in the opinion except for Part VII.

RODOWSKY, Judge, concurring.

I join in the judgment of the Court and in its opinion, with the exceptions of Part V.A. and so much of Part VI as is predicated on the holding in Part V.A. The line of cross-examination which the defense sought to pursue dealt with instances of actual contamination of samples in the control of others than the witness, who had no personal knowledge concerning what others had done. Thus, the majority opinion's interesting discussion of the theoretical ways in which a

DNA sample can be contaminated is not an issue presented by the record.